Thompson Maple Products, Inc., Appellant, *v.*
Citizens National Bank.

Argued June 12, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Malcolm Anderson,* with him *Frank G. McKnight,* and *Griggs, Moreland, Blair and Anderson,* and *Brown and McKnight,* for appellant.

*Irving Murphy,* with him *Frederick F. Jones, John A. Spaeder,* and *MacDonald, Illig, Jones & Britton,* and *Marsh, Spaeder, Baur, Spaeder & Schaaf,* for appellee.

OPINION BY HOFFMAN, J., September 15, 1967:

In this assumpsit action, the plaintiff, Thompson Maple Products, Inc., seeks to recover more than $100,-000 paid out on a series of its checks by defendant bank, as drawee. The payee's signature on each of the checks was forged by one Emery Albers, who then cashed the checks or deposited them to his account with the defendant.

44

The case was tried in the court below sitting without a jury. That court entered judgment in favor of the plaintiff in the amount of $1258.51, the face amount of three checks which the defendant had paid without any endorsement whatever.[1] It dismissed the remainder of the claim, and this appeal followed.[2]

The plaintiff is a small, closely-held corporation, principally engaged in the manufacture of bowling pin "blanks" from maple logs. Some knowledge of its operations from 1959 to 1962 is essential to an understanding of this litigation.

The plaintiff purchased logs from timber owners in the vicinity of its mill. Since these timber owners rarely had facilities for hauling logs, such transportation was furnished by a few local truckers, including Emery Albers.

At the mill site, newly delivered logs were "scaled" by mill personnel, to determine their quantity and grade. The employee on duty noted this information, together with the name of the owner of the logs, as furnished by the hauler, on duplicate "scaling slips."

In theory, the copy of the scaling slip was to be given to the hauler, and the original was to be retained by the mill employee until transmitted by him directly to the company's bookkeeper. This ideal procedure, however, was rarely followed. Instead, in a great many instances, the mill employee simply gave both slips to the hauler for delivery to the company office. Office personnel then prepared checks in payment for the

--------

[1] The defendant does not appeal from this award.

[2] The appeal is properly before this Court because the judgment actually awarded was in an amount less than $10,000. The governing statute provides: "[I]f the plaintiff . . . recovers damages . . . for a breach of contract, the amount of the judgment . . . shall be conclusive proof of the amount in controversy. . . ." Act of June 24, 1895, P. L. 212, §7.1, as amended, 17 P.S. §191.1. See also, *Glaser v. Prudential Insurance Company of America*, 351 Pa. 241, 40 A. 2d 488 (1945).

logs, naming as payee the owner indicated on the scaling slips. Blank sets of slips were readily accessible on the company premises.

Sometime prior to February, 1959, Emery Albers conceived the scheme which led to the forgeries at issue here. Albers was an independent log hauler who for many years had transported logs to the company mill. For a brief period in 1952, he had been employed by the plaintiff, and he was a trusted friend of the Thompson family. After procuring blank sets of scaling slips, Albers filled them in to show substantial, wholly fictitious deliveries of logs, together with the names of local timber owners as suppliers. He then delivered the slips to the company bookkeeper, who prepared checks payable to the purported owners. Finally, he volunteered to deliver the checks to the owners. The bookkeeper customarily entrusted the checks to him for that purpose.

Albers then forged the payee's signature and either cashed the checks or deposited them to his account at the defendant bank, where he was well known. Although he pursued this scheme for an undetermined period of time, only checks paid out over a three-year period prior to this litigation are here in controversy. See Uniform Commercial Code, Act of April 6, 1953, P. L. 3, as amended, §4-406, 12A P.S. §4-406.

In 1963, when the forgeries were uncovered, Albers confessed and was imprisoned. The plaintiff then instituted this suit against the drawee bank, asserting that the bank had breached its contract of deposit by paying the checks over forged endorsements. See U.C.C. §3-404, 12A P.S. §3-404.

The trial court determined that the plaintiff's own negligent activities had materially contributed to the unauthorized endorsements, and it therefore dismissed the substantial part of plaintiff's claim. We affirm the action of the trial court.

Both parties agree that, as between the payor bank and its customer, ordinarily the bank must bear the loss occasioned by the forgery of a payee's endorsement. *Philadelphia Title Insurance Company v. Fidelity-Philadelphia Trust Company*, 419 Pa. 78, 212 A. 2d 222 (1965); U.C.C. §3-404, 12A P.S. §3-404.[3]

The trial court concluded, however, that the plaintiff-drawer, by virtue of its conduct, could not avail itself of that rule, citing §3-406 of the Code: "Any person who by his negligence substantially contributes to . . . the making of an unauthorized signature is precluded from asserting the . . . lack of authority against . . . a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." 12A P.S. §3-406.

Before this Court, the plaintiff company argues strenuously that this language is a mere restatement of pre-Code law in Pennsylvania. Under those earlier cases, it is argued, the term "precluded" is equivalent to "estopped," and negligence which will work an estoppel is only such as "directly and proximately affects the conduct of the bank in passing the forgery. . . ." See, e.g., *Coffin v. Fidelity-Philadelphia Trust Company*, 374 Pa. 378, 393, 97 A. 2d 857 (1953); *Land Title Bank and Trust Company v. Cheltenham National Bank*, 362 Pa. 30, 66 A. 2d 768 (1949). The plaintiff further asserts that those decisions hold that "negligence in the conduct of the drawer's business," such as appears on this record, cannot serve to work an estoppel.

Even if that was the law in this Commonwealth prior to the passage of the Commercial Code, it is not the

---

[3] Section 3-404 of the Code provides: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it. . . ."

law today. The language of the new Act is determinative in all cases arising after its passage. This controversy must be decided, therefore, by construction of the statute and application of the negligence doctrine as it appears in §3-406 of the Code. *Philadelphia Title Insurance Company v. Fidelity-Philadelphia Trust Company,* supra, at p. 84.

Had the legislature intended simply to continue the strict estoppel doctrine of the pre-Code cases, it could have employed the term "precluded," without qualification, as in §23 of the old Negotiable Instruments Law, 56 P.S. §28 (repealed).[4] However, it chose to modify that doctrine in §3-406, by specifying that negligence which *"substantially contributes to . . . the making of an unauthorized signature. . . ."* will preclude the drawer from asserting a forgery. (Emphasis supplied). The Code has thus abandoned the language of the older cases (negligence which "directly and proximately affects the bank in passing the forgery") and shortened the chain of causation which the defendant bank must establish. "[N]o attempt is made," according to the Official Comment to §3-406, "to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case."

In the instant case, the trial court could readily have concluded that plaintiff's business affairs were conducted in so negligent a fashion as to have "substantially contributed" to the Albers forgeries, within the meaning of §3-406.

Thus, the record shows that pads of plaintiff's blank logging slips were left in areas near the mill which

---

[4] Thus, the Pennsylvania Bar Association Note on §3-404 observes: "The . . . phrase 'or is otherwise precluded' [in this section] continues the prior law as to estoppel, laches, and other grounds which prevent a person whose signature is forged from recovering. This is so because the same word 'precluded' was used in N.I.L. §23, 56 P.S. §28 (repealed). . . ."

were readily accessible to any of the haulers. More-over, on at least two occasions, Albers was given whole pads of these blank logging slips to use as he chose. Mrs. Vinora Curtis, an employee of the plaintiff, testi-fied:

"Q. Did you ever give any of these logging slips to Mr. Albers or any pads of these slips to Mr. Albers?

"A. Yes.

. . .

"Q. What was the reason for giving [a pad of the slips] to him, Mrs. Curtis?

"A. Well, he came up and said he needed it for [scaling] the logs, so I gave it to him."

Mrs. Amy Thompson, who also served as a book-keeper for the plaintiff, testified:

"Q. As a matter of fact, you gave Mr. Albers a pack of your logging slips, did you not?

"A. Yes, I did once.

"Q. Do you remember what you gave them to him for?

"A. I don't right offhand, but it seems to me he said he was going out to look for some logs or timber or something and he wanted them to mark some figures on. . . .

"Q. Well, if he was going to use them for a scratch pad, why didn't you give him a scratch pad that you had in the office?

"A. That's what I should have done."

In addition, the plaintiff's printed scaling slips were not consecutively numbered. Unauthorized use of the slips, therefore, could easily go undetected. Thus, Mr. Nelson Thompson testified:

"Q. Mr. Thompson, were your slips you gave these haulers numbered?

"A. No, they were not.

"Q. They are now, aren't they?

"A. Yes.

"Q. Had you used numbered logging slips, this would have prevented anybody getting logging slips out of the ordinary channel of business and using it to defraud you?

"A. Yes."

Moreover, in 1960, when the company became concerned about the possible unauthorized use of its scaling slips, it required its own personnel to initial the slips when a new shipment of logs was scaled. However, this protective measure was largely ignored in practice. Mrs. Amy Thompson testified:

"Q. And later on in the course of your business, do you remember Mr. Thompson said he wanted the logging slips initialed by one of the so-called authorized people?

"A. Yes.

"Q. [D]idn't you really not pay too much attention to them at all?

"A. Well, I know we didn't send them back to be sure they were initialed. We might have noticed it but we didn't send them back to the mill.

"Q. In other words, if they came to you uninitialed, you might have noticed it but didn't do anything about it.

"A. Didn't do anything about it."

The principal default of the plaintiff, however, was its failure to use reasonable diligence in insuring honesty from its log haulers, including Emery Albers. For many years, the haulers were permitted to deliver both the original and the duplicate of the scaling slip to the company office, and the company tolerated this practice. These slips supplied the bookkeeper with the payees' names for the checks she was to draw in payment for log deliveries. Only by having the company at all times retain possession of the original slip could the plaintiff have assured that no disbursements were made except for logs received, and that the proper

amounts were paid to the proper persons. The practice tolerated by the plaintiff effectively removed the only immediate safeguard in the entire procedure against dishonesty on the part of the haulers.[5]

Finally, of course, the company regularly entrusted the completed checks to the haulers for delivery to the named payees, without any explicit authorization from the latter to do so.

While none of these practices, in isolation, might be sufficient to charge the plaintiff with negligence within the meaning of §3-406, the company's course of conduct, viewed in its entirety, is surely sufficient to support the trial judge's determination that it substantially contributed to the making of the unauthorized signatures.[6] In his words, that conduct was "no different than had the plaintiff simply given Albers a series of checks signed in blank for his unlimited and unrestricted use." Cf. *Gresham State Bank v. O & K Construction Company*, 231 Ore. 106, 370 P. 2d 726 (1962); *Park State Bank v. Arena Auto Auction, Inc.*, 59 Ill. App. 2d 235, 207 N.E. 2d 158 (1965).

Finally, the plaintiff argues that the defendant bank cannot rely on §3-406 because it did not pay the checks

---

[5] We note that this procedure placed Albers in a position comparable to that of a trusted agent or employee, whose similar activities would have precluded his principal from asserting the forgeries, under §3-405(1)(c). That section provides: "(1) An endorsement by any person in the name of a named payee is effective if . . . (c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." The trial court's opinion characterizes Albers as an "agent" of the plaintiff, but makes no findings with reference to this section. We decline the invitation to do so now, since the decision must be affirmed on other grounds.

[6] In this connection, the trial court also noted that the plaintiff at all times prior to the commencement of this litigation failed to keep an accurate inventory account. It could not therefore verify, at any given point in time, that it actually possessed the logs which it had paid for.

in accordance with "reasonable commercial standards" as required by that section. All the checks were regular on their face and bore the purported endorsement of the named payee. It is asserted, however, that the defendant bank was required, as a matter of law, to obtain the second endorsement of Albers before accepting the checks for deposit to his account.

The short answer to that contention is that the trial court did not find, nor does the record show, that obtaining such a second endorsement is a reasonable, or even a general, commercial practice, where the depositor is well-known to the bank and where his identity can later be ascertained from code markings on the check itself.

Furthermore, under the Code, the bank did not have an unqualified right to a second endorsement. A check endorsed in blank is bearer paper. It is negotiable by delivery alone, without further endorsement. See U.C.C. §§3-201, 3-204, 12A P.S. §§3-201, 3-204.

To the extent that banks do obtain such endorsements, they apparently do so for their own protection, over and above that provided by the warranties arising on presentment and transfer. Cf. U.C.C. §3-414, 12A P.S. §3-414 (Contract of Indorser), with U.C.C. §3-417, 12A P.S. §3-417 (Warranties). In short, the practice is not designed for the protection of the drawer.[7] We are reluctant to hold that the plaintiff may shift the loss to the defendant bank, in this case, merely because the bank failed to exercise an excess of caution on its own behalf.

Judgment affirmed.

WATKINS, J., dissents.

---

[7] In any event, a second endorsement could not have protected *this* drawer, since the record shows that it was not plaintiff's practice to examine the backs of its checks when they were returned by the bank.