## Commonwealth v. National Bank
## & Trust Company of Central Pennsylvania

*Heath L. Allen, Metzger, Hafer, Keefer, Thomas &
Wood,* for Commonwealth.

*Richard H. Wix, Metzger, Wickersham, Kneuss & Erb,* for defendant.

LIPSITT, J., April 10, 1972.—In this proceeding, the poser is whether or not a collecting bank which cashes a check bearing a forged endorsement and collects the proceeds from a drawee bank is liable to both the drawee bank and the drawer of the check for the amount thereof. The case was instituted by the Commonwealth of Pennsylvania to recover the sum of $21,138.07 with appropriate interest. The complaint sets forth that defendant, National Bank & Trust Company of Central Pennsylvania (hereinafter referred to as "National Central"), accepted 136 checks drawn by the Commonwealth with the names of the payees fraudulently endorsed. Prior hereto,. National Central filed preliminary objections which were overruled October 18, 1968. The opinion backing the court's order is recorded at 46 D. & C. 2d 141, 90 Dauph. 71 (1968). Subsequently, National Central answered the complaint asserting new matter to which the Commonwealth replied. Trial was held in May of 1971 and a jury verdict returned on May 26, 1971, in favor of National Central. The matter is now before the court on motions by the Commonwealth for judgment non obstante verdicto and for a new trial.

The checks here are not in dispute. The Department of Highways (now the Department of Transportation and hereinafter referred to as the "department") of the Commonwealth of Pennsylvania in the course of its business mails checks for named payees to its various highway district and county offices. The Commonwealth does not maintain a single account in a single bank but has a number of accounts in numerous banks situated throughout the State. Its checks in payment of labor performed and for material and services supplied are prepared in Harrisburg through the com-

bined efforts of personnel of the department and of the Auditor General and State Treasury. These checks are then forwarded to the several outlying offices of the department for distribution. For a variety of reasons, such as death of the payee, errors in names and amounts, issuance to individuals on leave without pay status, erroneous rental agreements, etc., many of these checks are returned to the department offices in Harrisburg. During 1963 and 1964, a person who was serving in the position of supervisor of the payroll section of the department obtained 136 of the returned checks and forged the names of payees as endorsements. Of these checks drawn on 20 different drawee banks, 132 were presented by the dishonest employe at the office of National Central in Harrisburg where he received the face amount in cash and the remaining four were deposited by him to the credit of his account with National Central. Through normal banking channels, National Central collected on all the checks from the 20 drawee banks. These drawee banks, in turn, debited the accounts of the Commonwealth. The employe was found guilty of multiple counts of forgery and was sentenced to prison. He was ordered to make restitution but, having dissipated the funds, was not able to do so; hence, this controversy ensued.

The posture of this litigation is somewhat tortuous. The principal defense of National Central is based on the negligence of the Commonwealth, a factual issue which was presented to the jury. But despite the favorable jury verdict, National Central has also filed an instrument which it has labeled motion for judgment n.o.v., for lack of a more fitting title, to preserve its legal positions previously submitted to this court on preliminary objections in the form of a demurrer.

Defendant's motion comes about by reason of the following circumstances. Because the Commonwealth

had each drawee bank assign its rights against the collecting bank, National Central, the action was brought by the Commonwealth not only in its own right but also as the legal assignee of the drawee banks to recover the loss. By this procedure, the Commonwealth urges a multiplicity of law suits was avoided. However, National Central contends where a check is paid upon a forged endorsement, the drawee bank has no assignable cause of action against a collecting bank until it establishes that it suffered a loss to its depositor. Here, defendant says the drawee banks have not recredited plaintiff's accounts and thus sustained no loss to the depositor as a result of cashing the forged checks. Further, defendant protests against the assignment as a means of permitting the avoidance of any defenses a drawee bank may have against the claim of a drawer. In addition to the assignment problem, National Central argues the drawer of a check has no cause of action against a collecting bank which pays upon a forged endorsement, because an action in assumpsit must be based on some contractual or quasi-contractual grounds, and there was no contractual relationship between the Commonwealth and National Central. Thus, it contends the Commonwealth must seek its remedy against the drawee banks upon the contracts of deposit. Moreover, it is reasoned if any losses were sustained by the Commonwealth, it resulted from its voluntary action in failing to assert its contractual rights against the drawee banks. It is acknowledged that a drawee bank may have a cause of action against the collecting bank. As an additional defense, it is argued that the Commonwealth of Pennsylvania was paid by its bonding company, and the equitable rights of this real party in interest were inferior to those of the innocent defendant bank.

The contractual relationship between a bank and its depositor and the various legal theories bearing upon the rights and remedies of a drawer of a check against a collecting bank which receives it on a forged endorsement are discussed in some detail in the aforementioned opinion which disposed of the demurrer. While a division of legal opinion does exist, it appears that a majority of cases have held an intermediate collecting bank is liable to the drawer in cashing a check carrying a forged endorsement. See Annotation in 99 A. L. R. 2d 637. A California court, faced with the problem, after considering the provisions of the Uniform Commercial Code held privity of contract is no longer a bar to suit and said that the modern trend of procedure looks on circuity of action with disfavor. It extended third-party beneficiary principles to the check drawer: Allied Concord Financial Corporation v. Bank of America National Trust and Savings Association, 80 Cal. Rep. 622 (1969). In any event, as our previous opinion seeks to explain, the Commonwealth in this case is the legal assignee of the drawee banks and even though it may be logicized that these drawees have incurred no loss to the depositor, because they have not recredited plaintiff's account, there is neither case law nor any section in the Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 1-101, et seq., 12A PS §1-101, et seq., which would preclude the assignments. Thus, it must be concluded that the right to assign the cause of action is extant.

In connection with the claim that the Commonwealth was paid in full by its bonding company, defendant relies on the principles set forth in Bank of Fort Mill v. Lawyers Title Insurance Corporation, 268 F. 2d 313 (1959), where an attorney working for a title insurance company forged the name of the owner of real estate on a mortgage. A building and

loan association received the title insurance policy and drew a check for the amount of the mortgage loan against funds in a defendant bank, making the check payable both to the order of the purported borrower and the attorney. The attorney then forged the borrower's name as endorser and misappropriated the proceeds. When the title defect became known, the title company paid the building and loan association for the loss and took an assignment of the claim of the building and loan association arising out of the fraudulent transaction. The Fourth Circuit Court of Appeals held that the title corporation which claimed to be subrogated to the building and loan association's cause of action had an equitable rather than an absolute right and upon the balancing of the equities, a paid surety could not prevail over an innocent bank since the surety company is paid to assume the specific risk. A similar result was reached in Washington Mechanics' Sav. Bank v. District Title Ins. Co. et al., 65 F. 2d 827 (1933), and Meyers v. Bank of America Nat. Trust & Savings Assn. et al., 77 P. 2d 1084 (Calif., 1938).

The difficulty in this case in attempting to balance the equities between parties who are not guilty of culpable negligence arises not only because there is no Pennsylvania law imposing, as in some other jurisdictions, any obstructions to recovery by a surety company—indeed Pennsylvania Rule of Civil Procedure 2002(d) authorizes a subrogated carrier to sue in the name of the insured—but it appears that National Central is also protected in this suit by two surety companies which have been paid premiums by National Central to cover a potential loss. Consequently, whatever merit there is to the judicial thinking in the opinions cited by defendant on this point is simply not prevalent in the current situation.

So much for those particular legal positions advanced by National Central in its defense. Consideration must now be directed to the real bone of this controversy, and this is the question whether the negligence of the Commonwealth barred it from making any recovery against National Central. The jury in this case found there was evidence of negligence on the part of the Commonwealth. National Central argues this verdict should be upheld. The Commonwealth says it should be overturned.

The legal aspects involved require attention to be given to section 3-406 of the Uniform Commercial Code, 12A PS §3-406, which provides:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

Prior to the present code, the general law did not preclude the drawer of a check by reason of negligence from recovery from a bank which cashed it on a forged endorsement unless the drawer's negligence was such as to directly and proximately affect the conduct of the bank in the performance of its duties. See Land Title Bank & Trust Company v. Cheltenham National Bank et al., 362 Pa. 30 (1949). In Cheltenham, the court adopted a rather strong line, at page 35:

"The applicable rule of law is so firmly settled that it needs no elaborate citation of authorities to support it. If a check is made payable to the order of a person named therein the absolute duty of a bank honoring the check is to pay only to that payee or according to his order, and no amount of care to avoid error will

protect it from liability if it pays to a wrong person; it must ascertain and act upon the genuineness of the indorsement at its peril."

National Central argues that section 3-406 of the Uniform Commercial Code materially altered the pre-existing law and places its reliance upon Thompson Maple Products, Inc. v. Citizens National Bank, 211 Pa. Superior Ct. 42 (1967), where the Superior Court affirmed the action of the trial court in finding that Thompson's own negligent activities had contributed to a series of forged instruments. The majority of the court reasoned, at page 47:

"Had the legislature intended simply to continue the strict estoppel doctrine of the pre-Code cases, it could have employed the term 'precluded,' without qualification, as in §23 of the old Negotiable Instruments Law, 56 P.S. §28 (repealed). However, it chose to modify that doctrine in §3-406, by specifying that negligence which *substantially contributes to . . . the making of an unauthorized signature . . .* ' will preclude the drawer from asserting a forgery. (Emphasis supplied.) The Code has thus abandoned the language of the older cases (negligence which 'directly and proximately affects the bank in passing the forgery') and shortened the chain of causation which the defendant bank must establish. ' [N]o attempt is made,' according to the Official Comment to §3-406, 'to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case.'

"In the instant case, the trial court could readily have concluded that plaintiff's business affairs were conducted in so negligent a fashion as to have 'substantially contributed' to the . . . forgeries, within the meaning of §3-406."

The Commonwealth does argue at some length that National Central did not pay on the forged checks "in

accordance with reasonable commercial standards" of the banking business in violation of section 3-406 of the Commercial Code. This contention is based, for the most part, on the failure of the bank's tellers to require the endorsement by the person who presented the checks. Thus, it said, if the provisions of the code are not applicable, the prior case law as expressed in Cheltenham, supra, must pertain, and this places a heavy burden of proof on National Central which it did not meet at the trial. In rebuttal, National Central points out that the only testimony in this regard showed the bank for convenience of the State employes permitted customers, as was the forger who was known to the tellers, to present a second Commonwealth check drawn to another payee without requiring a second endorsement. No other testimony or evidence of commercial standards in this area was introduced. It must be deemed, therefore, that the jury's findings resolved the question of the practices by National Central and found them to be reasonable.

The Commonwealth cannot seriously disagree with the principle that a collecting bank which pays a check bearing a forged endorsement may escape liability to the drawer by establishing that the drawer has been guilty of negligence which contributed to the payment, but it denies negligence on its part as delineated in section 3-406 of the code. In this particular, the court's charge was vexing. The instructions did recite a point for charge submitted by the Commonwealth requiring a finding of negligence by the Commonwealth which would "directly and proximately" affect the bank's conduct. This, of course, was the pre-code rule. And while this statement would benefit the Commonwealth which lost the verdict, a reading of the whole charge reveals a submission to the jury of an inquiry into ordinary or conventional neglience. To so find would

be improper under the statutory provision. The jury should have specifically been told that there must be a finding of negligence which "substantially contributed" to the fraudulent act to preclude the Commonwealth from recovering its loss.

Looking at the record there was extensive testimony from several witnesses concerning the procedure of the payroll section of the Department of Highways with regard to the handling of checks. The forger was the supervisory employe in charge of this particular department and of the entire office. In his testimony, he explained how checks were sent to the field and why some checks were returned. The checks came back to his payroll section and were accounted for and eventually returned to the State Treasury for crediting to the Motor License Fund. The testimony of others confirmed his explanation of the various procedures of the payroll section. In this situation, checks were not handled by a great many people nor were they disregarded. This forgery scheme was executed by the supervisory employe in charge of the office and, conceivably, another employe of the payroll section could not have carried out the scheme. From this evidence, a jury might find ordinary negligence but might not find negligence within the statutory meaning.

An analysis of Thompson, supra, clearly reveals that the court, at page 47, regarded the negligence doctrine as it appears in section 3-406 of the code as a change in the prior law (i.e. negligence which "directly and proximately affects the bank in passing the forgery") by shortening "the chain of causation which the defendant bank must establish." But the opinion also implies that more than conventional negligence must exist. While the court does not define the degree of negligence, it points to the official comment in the statute which states the question should be left to the

court or jury upon the circumstances of the case. The facts in Thompson showed plaintiff-drawer adopted a business method which placed the forger in a position to perpetrate the fraud. The scheme which led to the forgeries was described by the court as follows, at page 45:

"Albers was an independent log hauler who for many years had transported logs to the company mill. For a brief period in 1952, he had been employed by the plaintiff, and he was a trusted friend of the Thompson family. After procuring blank sets of scaling slips, Albers filled them in to show substantial, wholly fictitious deliveries of logs, together with the names of local timber owners as suppliers. He then delivered the slips to the company bookkeeper, who prepared checks payable to the purported owners. Finally, he volunteered to deliver the checks to the owners. The bookkeeper customarily entrusted the checks to him for that purpose.

"Albers then forged the payee's signature and either cashed the checks or deposited them to his account at the defendant bank, where he was well known."

The Commonwealth's conduct in the instant case was surely not on the same level with the negligent activities of the drawee present in the Thompson case.

National Central certainly feels as the verdict winner that the jury has already determined that the Commonwealth "substantially contributed" to the forgeries in the instant case, and the evidence was sufficient to reach such conclusion. It points out a number of safeguards the Commonwealth may have taken to stop the negotiability of the checks after they were returned. However, hindsight alone is not sufficient if the dishonesty was not reasonably or perhaps substantially foreseeable. The Commonwealth argues that even by applying concepts of ordinary negligence, one

cannot, in a legal sense, find the Commonwealth committed any act of negligence which enabled this employe, apart from the fact of his employment, to forge these checks. The Commonwealth believes the evidence, by no means, could sustain a finding of the Commonwealth "substantially" contributing to the fraudulent deed. The case is troublesome but in the interest of justice and fairness, the case should be retried and the jury correctly and clearly instructed as to the nature of the negligence required and a decision reached based on the circumstances of this particular case.

Consistent with the foregoing discussion, we enter the following

ORDER

And now, April 10, 1972, the motion of plaintiff, Commonwealth of Pennsylvania, for a new trial is granted.

**Dunwoody Estate**

Before Klein, A. J., Bolger, Lefever, Saylor, Shoyer and Silverstein, JJ.

LEFEVER, J., November 9, 1970.—This matter comes before the court on petition and answers. Petitioner is Frank A. Bedford, 3rd (hereinafter designated "husband"). Respondents are: (a) Virginia K. Bedford, petitioner's wife at the time the petition was filed (hereinafter designated "wife"); (b) the Fidelity Bank and Richard F. Ennis, Trustees under Will of Edwin H. Dunwoody (hereinafter designated "trustees"); and (c) Judith J. Jamison, Esq., guardian ad litem for the Bedfords' three minor children and trustee ad litem for wife's unborn issue (hereinafter designated "the ad litem").

The court signed a preliminary decree, dated October 30, 1969, directing the issuance of a citation to respondents. The citation was issued and responsive answers were filed.

The question before the court is whether an option granted to husband and wife to purchase 256 Beech Hill Road, Wynnewood, Pa., can be exercised by

husband alone, upon his tender of the agreed price to trustees, the title holders of the real estate covered by the option, without the joinder of wife.

Husband and wife were married on August 14, 1948. The youthful couple had just been graduated from high school. Their plans and dreams contemplated (a) husband's entry into the College of the University of Pennsylvania and his subsequent admission to, and graduation from, law school, and (b) wife's attendance at college. Husband's sole income during college and law school was derived from part-time employment during the school year and full time employment during vacations. In contrast, wife was the beneficiary of the income from a substantial trust created by her great-grandfather; support allowance contributed to her by her grandfather, Edwin Dunwoody, during his lifetime, and after his death the income from the instant trust he created for her; and finally, upon her mother's death, considerable assets she inherited from her.

In due course, husband successfully completed college and law school and was admitted to the bar; wife finished one-half year at Harcum Junior College; and three children were born, namely, Frank A. Bedford, 4th, on June 5, 1949, Suzanne H. Bedford on September 15, 1952, and Robert B. Bedford on August 23, 1956.

Husband and wife lived harmoniously in various rented apartments and houses in Philadelphia and the suburbs until July 18, 1955, when they moved into their first "own home," located at 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pa. The land on which the house was situated and the materials for its construction were purchased by Edwin H. Dunwoody. Title was taken in Dunwoody's name. However, much of the house was built by the

manual labor of husband who had acquired the necessary skills by working for various construction companies after school hours and during school vacations, and carpentry was his major hobby. In this building project, husband received "assistance from time to time of wife." This house was not fully completed when they moved into it in 1955, and the unfinished work was done by husband and wife throughout the following year. The house was included as one of the assets of the corpus of the trust, created by wife's grandfather, in his will, which provided, inter alia, that:

"ITEM FIVE: I direct my Trustees to permit my granddaughter, MARY VIRGINIA BEDFORD, and her family to use and occupy premises 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pennsylvania, if I own said premises at the time of my death and so long as she, the said MARY VIRGINIA BEDFORD, may desire. Such use and occupancy is to be without charge and if the said MARY VIRGINIA BEDFORD desires that these premises, 132 Fairview Road, Penn Valley, Lower Merion Township, Montgomery County, Pennsylvania, be sold and the proceeds invested in a different home for herself and her family the full cooperation of my Trustees is requested."

Eventually, this house became too small (a) to accommodate the Bedfords' expanding family and (b) to provide space for husband's growing law practice, which required a law office, a waiting room and quarters for his secretary, all of which were squeezed into the Fairview Road Home. Both Bedfords desired to acquire a larger home which would provide appropriate facilities for their family and space for husband's law practice; in addition, it appeared that Federal income tax advantages would accompany such an arrangement. The property at 256 Beech Hill Road,

Wynnewood, admirably suited their needs. However, the Bedfords did not have the funds with which to purchase this larger and more valuable property. They, therefore, requested trustees to assist them in accomplishing their desires. Trustees agreed to do so.

On August 19, 1959, trustees and wife filed a petition with this court requesting leave to trustees to use trust assets to purchase the Beech Hill Road property. The petition averred, inter alia, "That pursuant to Item Five of said Will, petitioner, Mary Virginia Bedford, desires that premises 132 Fairview Road, Penn Valley, Narberth, Pennsylvania, be sold and the proceeds therefrom, together with such additional trust funds as are necessary, be invested in another home as hereinafter indicated for herself and her family," and "That the Trustees and the life tenant desire that the Beech Hill Road property be purchased as a trust investment employing funds from the sale proceeds of the 132 Fairview Road property and the remaining necessary funds from trust principal." The petition and attached affidavits were signed by trustees and wife.

In view of the fact that under testator's will wife's children had a remainder interest in the trust, the court appointed Judith J. Jamison, Esq., guardian ad litem for the minor children and trustee ad litem for any unborn issue of wife. The court deliberately appointed an able female lawyer as ad litem, and directed her to investigate the legal aspects of the case, view the plan through the eyes of a married woman and then file her report and recommendation. Mrs. Jamison made a complete investigation, including physical inspection of both homes and discussing the proposed plan with wife.

Thereafter, following protracted negotiations among trustees, trustees' counsel, the ad litem and the Bedfords and several conferences of counsel with

the court, trustees entered into tentative written agreements with the Bedfords, dated October 28, 1959, and October 30, 1959, which provided, inter alia, that:

a. Trustees would purchase the Beech Hill Road property, as a trust asset, for $52,500;

b. The net proceeds of the Fairview Road property, which would be sold at auction and which, when sold, amounted to $29,280.53, were to be applied to the purchase price of the Beech Hill Road property;

c. The difference between said net proceeds and $40,000, viz. $10,719.47, was to be paid by the Bedfords;

d. The remaining $12,500 plus the settlement costs, a total of $13,439.91, were to be advanced by trustees, to be repaid by the Bedfords in quarterly installments of $300;

e. Title was to remain in trustees, but the Bedfords were to be given the option of purchasing the Beech Hill Road property at any time within 10 years for $52,500, less whatever payments, specified in subparagraphs c and d above had been made by the Bedfords;

f. In the event of wife's death, prior to the exercise of the option, husband would pay interest at the rate of six percent per annum on the unpaid balance of the loan; and

g. The Bedfords were to forfeit all moneys advanced by them to trustees, if the option was not exercised within 10 years.

These agreements were made subject to the approval of the court. However, none of the agreements contained any provision covering the separation or divorce of husband and wife. This contingency was apparently not considered or even thought of by any of the parties or the court.

The ad litem filed an extensive, thoughtful, carefully prepared written report. In it she stated that husband and wife seemed to be a devoted married couple and

when she tactfully asked wife the specific question as to her relationship with husband, the latter answered that her marriage was a happy one. Moreover, the Bedford children seemed to be a loved part of an affectionate, closely-knit family. [Here, the court quoted at length from the ad litem's report which concluded that the agreement was fair and recommended that the court approve it.]

After careful consideration of the report of the ad litem and the above-mentioned agreements and further conferences with the ad litem and counsel for all parties, the court entered a decree dated October 29, 1959, which approved the plan set forth above and authorized trustees to use the necessary corpus of the trust to accomplish it.

Thereafter, the lease-purchase agreement was signed, the Fairview Road house was sold for a net price of $29,280.53, and the balance of $10,719.47 was paid by check in the amount of $7,000 drawn upon wife's account and the $3,719.47 balance was paid by husband and wife, although there is dispute as to who provided these funds. Subsequently, the regular quarterly payments of $300 were punctiliously made until the required $12,500 and settlement costs were paid, although, again, there is controversy as to whose funds were used to make these payments. The final date to exercise the option was October 30, 1969.

During the intervening years, marital differences arose between the Bedfords and on October 24, 1968, they separated, husband moving to an apartment at Oak Hill Apartments, Penn Valley, Narberth, Pa., and wife remaining in the home at Beech Hill Road with the three children.

On October 1, 1969, after wife had refused to join in the exercise of the option, husband gave trustees notice that he intended to exercise it and tendered his

check in the amount of $31,020.44, representing the full amount of the balance due. On the following day, trustees, through their attorney, refused to accept husband's exercise of the option on the ground that he alone did not have power to do this, and returned his check to husband. Husband then filed the pending petition.

Since their separation, husband and wife have been continuously engaged in a series of lawsuits in the Montgomery County courts involving: (1) a contested divorce action; (2) various suits by wife against husband for support of herself and her children; and (3) litigation to determine ownership of a racing boat, a "Cal 40," which is 40 feet long, sleeps eight people, has a good racing record, is well known, is named "Windborne," and is titled in the joint names of husband and wife (it appears from the evidence that this boat was bought with the proceeds of the sale of their first boat which husband built over a period of three years and sold for a net price of $19,000, plus a loan made from bank by husband, secured by collateral based upon an inheritance received by husband from a member of his family); and, finally, the present case concerning the exercise of the option, which has produced a record of over 300 pages. Meanwhile, the homestead at Beech Hill Road has increased in value from the $52,500 purchase price to the current appraised value of $78,000.

Petitioner takes the position that the option is worth approximately $50,000, viz., the $22,410.27 already paid by the marriage entity, towards the purchase of the property, and the increased value of the property; and that since wife did not join in the exercise of the option, he had the right to do so alone. Wife and trustees take the position that the option could not be exercised without the joinder of wife and since she refused to join husband in exercising the option and the dead-

line of October 30, 1969, has passed, the option has ceased to exist.

The above-recited extended litigation between husband and wife and their conduct throughout the current case evidences the bitterness and hatred which has developed between them. It was particularly noticeable when husband and wife, respectively, were on the witness stand. Both seemed to gloat in publicly demonstrating their hostility to each other and in revealing the other's sins. The court urged them to refrain from this, but noted of record that if they "wanted to wash dirty linen in court, then that is the prerogative of litigants." They fully exercised this prerogative.

Husband and wife were so self-centeredly interested in venting their spleen against each other and obtaining court victory that they have almost completely ignored the welfare of their children. Each has testified to, or implied, acts of infidelity upon the part of the other. Moreover, wife testified that husband forced her into a "blackmail agreement" with respect to the filing of income tax returns at the time of the separation. Finally, in refusing to join in the exercise of the option, wife is selfishly attempting to obtain for herself the advantage of all moneys spent upon the house by the marriage entity and all of the profit arising during the past 10 years from the increased value of this house.

It would appear that husband undertook most of the negotiations with trustees in this transaction. This was normal for a husband to do, especially since he was a lawyer. Wife's counsel urges that husband's conduct was improper, fraudulent and even unethical, and that he should have advised and urged wife to employ independent counsel to advise her. This argument is absurd. Husband and wife were happily married. The law would truly be amiss if it required

every happily married, trustful wife to employ independent counsel whenever the married pair bought a house, or an automobile, or a boat, or securities, or decided to enter into any financial transaction, major or minor. No more conducive cause for disharmony and possible divorce could be devised than this. Moreover, wife testified that before the purchase of the Beech Hill Road house she had consulted a Norristown lawyer, named Hastings, and later the able lawyer and former Pennsylvania Bar Association President, Desmond J. McTighe, Esq., with respect to her domestic difficulties. Wife was a cultured, educated woman, married to a lawyer, and experienced in obtaining advice of counsel when she felt the need; rightly, she had no fears about the purchase of the Beech Hill property, because the agreements were eminently fair. Nichols v. Nichols, 149 Pa. 172 (1892), and Shapiro v. Shapiro, 424 Pa. 120 (1966), relied upon by wife's counsel, are not at all applicable because in the instant case, husband did not deal with wife's property; he and wife jointly agreed to purchase the house at Beech Hill Road and to use part of the trust corpus as the vehicle to make that possible. However, Mr. Justice Cohen's dissent in Shapiro is most apt, and his advice appearing on pages 139 and 140, could well be heeded by the parties here, namely: [This is not printed here as the cogent portion of the opinion appears in the opinion of the court en banc, post.]

True, it would be to wife's present advantage to prevent husband from exercising the option jointly or individually. But husband and wife, as members of the marriage entity, provided the $22,410.27 difference between the proceeds received from the sale of the Fairview Road property and the purchase price of the Beech Hill Road property. Furthermore, the latter property increased $26,000 in value during the 10

years that the lease-purchase agreement was in existence and the Bedfords occupied it as their own home. Moreover, they made substantial improvement and repairs to it, costing in the neighborhood of $5,000, fully expecting, until their marital discord developed, that ultimately they would own this, their home, as tenants by the entireties. As husband testified, "Well from the outset it was understood that this option would be exercised. There was never a doubt between us. Right from the time that we got it up it was understood that this lease option was a device . . . to buy this property. Of course, we treated it as our own." To allow wife to reap the sole benefit from the payments of $22,410.27 made by the marriage entity and the increased valuation of the property fits wife's counsel's apt, but misapplied, statement in his brief: "A more outrageously inequitable result could hardly be imagined." Equity dictates that these amounts should be equally shared by husband and wife, along with the other assets acquired by them during the tenure of this marriage union.

There is no doubt that during a considerable period of this marriage the income of wife from her family, her trust funds, her mother's estate and support supplied by her grandfather during his lifetime and later from the trust he created for her was much larger than that of husband, at least in the early years of this marriage, because, with the express approval of both parties, husband attended college and law school and later embarked upon the tedious, slow and difficult task of building a law practice. However, one matter is crystal clear, viz., the obligations to trustees were punctiliously met and the $12,500, plus settlement costs were repaid to trustees by the Bedfords, irrespective of who paid what portion thereof.

The record indicates that the Bedfords lived well,

even luxuriously, for comparatively young married people; that wife had a substantial independent income and that, like many married couples (rich or poor), they spent most of their combined incomes for necessaries and luxuries. It also appears that certain expenses were usually paid by one spouse, some by the other, and although wife now has a feeling of unfairness at the extent of her own contribution, it is patent that husband also devoted the major part of his income to the support of his family. The Bedfords' standard of living could not have been maintained without their joint contributions. Moreover, there is no evidence that, at the times involved, wife was not satisfied to add her income to husband's to make this possible. Moreover, it is to be noted that wife testified that during their marriage she never balanced the checkbook or added up the various expenses. She merely drew checks to pay for bills or items as needs arose.

None of this, however, is really germane to the issue. In a happy, successful marriage each spouse makes contributions. How can a court, or anyone else, evaluate the late hours spent by a husband in an effort to succeed in his profession, viz., after working during a regular business day, as house counsel to a corporation and then spending three nights a week in a home law office? How does one evaluate the time and effort expended by a wife in running a house, cooking, cleaning, carrying a child during pregnancy, and in caring for children during their babyhood and later when of school age? In a happy marriage, each partner contributes his or her share.

The court is satisfied that both husband and wife contributed the major portion of their respective incomes from various sources to the needs of the family and the operation of the household. Therefore,

all payments made to trustees towards the purchase price of the Beech Hill Road house were contributions from the marriage entity and constituted equal contributions by husband and wife, irrespective of the amounts in dollars paid by each. Moreover, where there is any uncertainty on this subject, there is an inference that each party paid half. See Zahorsky v. Leschinsky, 394 Pa. 368. Hence, husband and wife are each entitled to an equal undivided interest in the house, at its increased value. It follows from the above that husband and wife were jointly entitled to exercise the option to purchase the house prior to the expiration of the option date and if she refused, the husband had the legal right to exercise the option alone. It is to be noted that the exercise of the option will not cause any loss to the trust corpus, because the full book value of the Beech Hill Road house investment, viz., $52,500, will be replaced by cash in the trust corpus.

There is little Pennsylvania law on the subject of exercise of a joint option. There appears to be only one Supreme Court decision directly in point, namely, Schaeffer v. Herman, 237 Pa. 86 (1912). In that case an option had been obtained in the joint names of Schaeffer and Sheffer. Thereafter, differences arose between them and Sheffer refused to join in the exercise of the option; furthermore, he obtained another option for himself and others. The court held that Sheffer's refusal to join in the exercise of the option did not destroy Schaeffer's rights; and that Schaeffer had the right to exercise the option, alone, stating, at page 92, et seq.:

"The learned court below found as a fact that Sheffer in taking the new option, and Herman [the vendor] in giving it, acted in bad faith and in wilful disregard of the rights of Schaeffer under the original agreement. Under this state of facts, it is perfectly clear, that the

rights of Schaeffer under the original agreement should be protected, provided he was in position to assert them without the co-operation of Sheffer. It is contended for appellants that when a contract for the purchase of real estate recites that the conveyance shall be made to two persons, a bill cannot be maintained by one to compel the vendor to convey the entire title to that one . . . *Even if Schaeffer be considered nothing more than a joint purchaser with Sheffer, he had the right to pay, or tender payment of, the entire purchase price, and when he did so, the most Sheffer could insist upon was that as to his share, Schaeffer held an equitable title, which could not be asserted without Sheffer either paid, or tendered, his share of the purchase money, and this he failed to do. There is a fiduciary relation existing between joint tenants, joint vendees and joint optionees, which gives to one the right to perform acts beneficial to the common estate. Surely, Schaeffer, one of the optionees, had the right to pay, or tender payment of, the entire purchase price, and when he did so, as the court below found he did, the optionors were not in position to say we will not comply with our covenant to convey because both of the optionees did not join in making the tender. Either one of the optionees could tender the entire purchase price and thus exercise the option* . . . We therefore conclude, under the facts as found, that Schaeffer was in position to compel specific performance of the contract." (Italics supplied.)

Like Schaeffer in the cited case, husband in the instant case elected to exercise the option and tendered the agreed price. Moreover, like Sheffer, wife, acting in bad faith in an effort to destroy the option, refused to join in the exercise thereof. This placed trustees in a difficult position. Their refusal to accept husband's exercise of the option and his accompanying check

constituted proper trustee action and fulfilled their duty to protect the trust. This left final determination of the issue for the court. . . .

[Here the opinion cites and quotes from Bolich v. Lynn, 47 Pa. County Court Reports 578, 581 (C. P. Northampton, 1919); Madden v. Gosztonyi Savings & Trust Co., 331 Pa. 476 (1938); Stevens Estate, 15 D. & C. 2d 199 (1958); Magee v. Morton B. & L. Assn., 103 Pa. Superior Ct. 331, 337 (1931); Williams v. Barbaretta, 359 Pa. 488 (1948); Schweitzer v. Evans, 360 Pa. 552 (1949); Stemniski v. Stemniski, 403 Pa. 38 (1961); Berhalter v. Berhalter, 315 Pa. 225 (1934); Reifschneider v. Reifschneider, 413 Pa. 342 (1964); Nachman v. Nachman, 417 Pa. 389 (1965); and Lindenfelser v. Lindenfelser, 383 Pa. 424 (1956).]

Applying the principles of law established in the cited cases, husband in the instant case had the right and power to exercise the option on behalf of the tenancy by the entireties. Moreover, wife did not have the power to defeat husband's exercise of the option. Wife's refusal to join husband in exercising the option was an attempt to destroy the option and to deprive the entireties estate of a valuable asset, namely an equity in the Beech Hill Road property worth about $50,000. Wife specifically testified that her action was motivated by her desire to keep the property permanently in the trust, of which she was the income beneficiary and in which husband had no interest.

The ad litem vigorously argued that husband did not have the right to exercise the option without the joinder of wife. She urged that it would be contrary to testator's intention and to the detriment of both wife and the remaindermen of the trust, whom she represented, for the court to permit this. However, portions of her brief bear on the issues before the court, . . . [brief quoted at length].

Wife has testified with bitterness and hostility that the idea of purchasing the Beech Hill Road house was solely the husband's and not hers; that she did not wish to leave the Fairview Road house; that, at most, she was reluctant to do so; that she and husband were having marital difficulties at the time and she had, therefore, consulted counsel in re possible divorce action. The ad litem's report at that time, her present brief, and her testimony at the hearing on the instant petition are diametrically opposed to this . . .

Where their testimony differs, the court believes the ad litem and disbelieves Mrs. Bedford.

In short, this lease-purchase agreement was the joint action of a happily-married couple with three young children, who were eager to acquire, and ultimately own, a more spacious, luxurious home, better adapted to their needs. Both husband and wife were in complete agreement with the terms of the agreement. They jointly shared the dream of owning this beautiful new home. Wife completely approved the arrangements imaginatively devised by her lawyer-husband. She is intelligent, educated and experienced. She knew what she was doing. Neither husband nor wife anticipated the sad turn their marriage would take. Hence, the valuable equity in the property was an asset of the entireties' estate.

## FINDINGS OF FACT

The court makes the following findings of fact:

1. In 1959, both husband and wife wished to acquire the property at 256 Beech Hill Road, Wynnewood, Pa., as a home, and to own title thereto, as tenants by the entireties, within 10 years of acquiring it, and to use a portion of the corpus of this trust as a vehicle to make this agreement possible.

2. Both husband and wife understood and approved

the plan devised to accomplish the acquisition of the aforesaid home.

3. At the time the lease-purchase agreement was executed, both husband and wife fully intended to exercise the option to purchase the Beech Hill Road property before the option expired on October 30, 1969.

4. Husband and wife were happily married in October 1959, and neither contemplated separation or divorce; hence, this was not provided for in the agreement. However, the possibility of wife's death was considered, and provision was made therefor.

5. Exercise of the option does not cause any loss of corpus to the trust, but, in fact, replaces real estate with cash in the amount of the investment, viz., $52,500.

6. Husband and wife contributed the major portion of their respective incomes to the purchase of the Beech Hill Road house and the operation of the household, including payment for food, clothing, automobiles, schooling, taxes, etc., although wife's contribution was greater in the early years of their marriage owing to the fact that, by mutual consent, husband was attending college and law school.

7. There is no credible evidence that prior to the separation of the Bedfords in October 1968, either party had amassed a separate estate, and if any separate estate was acquired by either of them, what the amount or value thereof was.

8. Husband, in good faith, prior to the expiration date of the option, offered to exercise the option and tendered his check to trustees in the amount of $31,020.44, the full amount necessary for the purpose.

9. Wife, in bad faith, refused to join husband in the exercise of the option, with the intent to deprive husband of any interest in the amounts paid by the marriage entity toward the purchase of the house, its

improvement and repair, and the increase in its value, and thereby to acquire the use of the house for herself as life tenant of the trust, to the exclusion of husband and to use this as leverage in her litigation against him in the divorce action, the support claim and the suit over the ownership of the boat.

10. The option to buy the house is an asset of the marriage entity.

## CONCLUSIONS OF LAW

The court reaches the following conclusions of law:

1. Husband and wife fully understood the lease-purchase agreement when they executed it and they are bound by its terms.

2. Wife cannot deprive husband of his interest in this valuable option by refusing to join in the exercise thereof.

3. Wife acted in bad faith in refusing to join in the exercise of the option.

4. Husband had the right and power to exercise the option, alone.

5. Husband properly exercised the option when he tendered his check to trustees in the requisite amount of $31,020.44 on October 1, 1969.

6. Trustees should have accepted the check and executed a deed to husband and wife as tenants by entireties on October 1, 1969; however, their refusal to do this was done in good faith and on proper advice of counsel.

7. The filing of this petition constituted lis pendens, preserved the option and prevented the option from expiring on October 30, 1969.

8. Husband and wife are now entitled to exercise the option.

9. Fees herein or hereafter awarded to counsel for trustees for services rendered in the instant case and

compensation to the ad litem herein or hereafter allowed are to be charged to the corpus of the trust, but the trust is to be reimbursed therefor by adding such fees and compensation together with costs of settlement to the purchase price of the property.

10. If wife joins husband in exercising the option, each shall pay one half of the balance of the purchase price of the property, including fees to trustees' counsel, compensation to the ad litem and settlement costs; if, however, wife refuses to join husband in exercising the option and husband elects to exercise the option alone, husband shall pay the balance of the purchase price of the property, including fees to trustees' counsel, compensation to the ad litem and settlement costs . . .

*Norman H. Brown,* for petitioner.

*Lawrence A. Brown,* for respondent.

*J. Victor O'Brien,* of *Fox, Rothschild, O'Brien & Frankel,* for truetees.

*Judith J. Jamison,* guardian and trustee ad litem.

## OPINION SUR EXCEPTIONS

SAYLOR, J., December 17, 1971.—No useful purpose would be served by attempting to rehash the sordid details of the acrimonious and disgusting warfare which this couple, who have been divorced since this litigation began, have been waging. They are both so full of hate and desire for vengeance that they have completely forgotten their responsibilities and obligations to their three children, aged 21, 19 and 15, who are the innocent victims of this disgraceful litigation.

Judge Lefever, in a carefully thought out opinion, has fully described the factual background of this case and has ably reviewed the applicable decisions. Although there may appear to be some merit to the arguments advanced by these two fierce warriors, basically they are both wrong. We are in full agreement with