SULLIVAN, Justice.
Kenneth B. Wulf stole more than $500,000 from his employer, Auto-Owners Insurance Company, by depositing checks payable to Auto-Owners into a personal account he opened at Bank One in the name of “Auto-Owners, Kenneth B. Wulf.” Auto-Owners contends that Bank One violated § 405 of the Indiana Uniform Commercial Code by not exercising ordinary care when it opened Wulf s account. However, we hold that § 405 applies to opening *1088 new accounts only in circumstances not present here.
Background
Kenneth Wulf worked in the Claims Division of Auto-Owners Insurance from May 1988 until he was terminated in July 1998. Wulf started out as a claims representative, and then became a resident adjustor. In his capacity as a resident adjustor, Wulf handled various kinds of insurance claims for Auto-Owners. One of Wulfs responsibilities was to pursue subrogation and salvage claims on behalf of the insurance company.[1] In the context of this responsibility, Wulf (like other adjustors) handled the file for each case and the checks that Auto-Owners received for subrogation and salvage. When a check arrived, clerical staff would open it and attach it to the relevant file before passing the check and file on to the adjustor. No other record was kept of such checks. It was the adjustor’s responsibility to forward the checks back to clerical staff, who would then send the checks to Auto-Owners’s main office in Michigan. It was Auto-Owners’s policy for all files to be reviewed by a manager every six months.
In 1991, Wulf opened an account at Bank One in the name of “Auto-Owners, Kenneth B. Wulf.” (App. at 396.) Wulf used a post office box as the address for the account. Bank One did not request, nor did Wulf provide, any documents to confirm his authorization to open and use the account on behalf of Auto-Owners. Wulf used a stamp that said “Auto Owners Insurance Deposit Only” to endorse checks made out to Auto-Owners and deposit them into his account. (App. at 392.) Wulf deposited a total of $546,000 meant for Auto-Owners into his account over the course of almost eight years. Another Auto-Owners employee discovered Wulfs conduct in 1998, while Wulf was on vacation, during an examination of the file of one of the claims Wulf had handled. Until that time, Auto-Owners did not suspect any untoward activity.
In the trial court, Auto-Owners alleged that Bank One had failed to exercise ordinary care in its opening of Wulfs account, that this failure substantially contributed to Auto-Owners’s losses, and that Bank One was liable for Auto-Owners’s losses up to the moment of discovery, regardless of any statute of limitations. Bank One denied that it had failed to exercise ordinary care at any time and contended that the three-year statute of limitations, Ind. Code § 26-1-3.1-118(g), precluded recovery for any checks paid before October 30, 1995. The trial court granted Bank One’s motion for summary judgment and denied Auto-Owners’s motion for partial summary judgment (on the statute of limitations issue only) on October 15, 2005. The Court of Appeals affirmed. Auto-Owners Ins. Co. v. Bank One, 852 N.E.2d 604 (Ind.Ct.App.2006). Auto-Owners sought, and we granted, transfer on two questions: whether Bank One was subject to an ordinary care requirement for its actions in opening an account for Wulf, and if so, whether Bank One’s failure to exercise ordinary care substantially contributed to Auto-Owners’s losses. Auto-Owners v. Bank One, 869 N.E.2d 447 (Ind.2007) (table). Auto-Owners did not raise the statute of limitations issue in its Petition for Transfer, and we summarily affirm the *1089 Court of Appeals on it. Ind. Appellate Rule 58(A).
Discussion
I
Much of the disagreement in this case revolves around, and our decision rests upon, Indiana’s version of § 405 of the Uniform Commercial Code (“UCC”). Section 405 is found in Ind.Code § 26-1-3.1-405 (2004). Subsection (b) is the focus of debate:
(b) For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent endorsement of the instrument, the endorsement is effective as the endorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the person bearing the loss proves that the failure to exercise ordinary care' substantially contributed to the loss.
Auto-Owners asserts in its Petition for Transfer that Bank One failed to “exercise ordinary care” in opening a bank account in Auto-Owners’s name for Wulf, and that this failure “substantially contributed” to Auto-Owners’s loss. (Appellant’s Pet. to Trans, at ii.)
We begin with the question of whether Bank One exercised ordinary care. Auto-Owners’s reading of § 405(b) on this point fails to take into account both the language of and the purpose behind the statute. Auto-Owners claims that Bank One should have invested more energy in confirming Wulfs legitimacy when Wulf opened a bank account in Auto-Owners’s name in 1991. However, § 405(b) makes no mention of a bank’s responsibilities when opening an account for a new customer. Rather, subsection (b) requires ordinary care from a bank in the “paying” or “taking” of an instrument. Indeed, Bank One pointed out during oral argument that the procedures in place to be applied during the opening of an account are often there for the protection of the bank, not a particular customer. See also 2 James J. White & Robert S. Summers, Uniform Commercial Code § 19-4(h) (4th ed.1995) (implying that bank account-opening procedures may be self protection). Such an approach, which is not incompatible with the requirements of § 405(b), would suggest that often a bank hurts no one but itself if it fails to follow its own procedures when opening a new account.[2]
As to the purpose behind the statute, the first comment to § 405 reveals, and the Court of Appeals also pointed out, that in the absence of a bank’s negligence, § 405 shifts the responsibility for monitoring possibly wayward employees away from a bank and onto the employer. The rationale for this responsibility shift is that an employer is in a better position to select and supervise its employees than an out *1090 side bank. More relevant to the situation at hand, an employer is also better able to put in place measures to prevent fraud among its employees. Auto-Owners Ins. Co., 852 N.E.2d at 612-13 (citing I.C. § 26-1-3.1-405 cmt. 1). Accord White & Summers, supra, § 19-4.
This is not to say that the circumstances of opening an account could never play a role in whether a bank has used ordinary care in paying or taking a check. Auto-Owners calls attention to the fourth comment to § 405, which outlines a scenario in which an employee might open an account in the name of a prominent corporation and use the account to deposit instruments payable to the corporation. I.C. § 26-1-3.1-405 cmt. 4. By Auto-Owners’s interpretation, comment four supports liability for Bank One because the comment countenances an employee doing what Wulf did — opening a bank account in his employer’s name. However, the comment states that “[fjailure to exercise ordinary care is to be determined in the context of all the facts relating to the bank’s conduct with respect to the bank’s collection of the check.” Id. (emphasis added). This emphasis is consistent with the language of § 405(b), which stresses “ordinary care in paying or taking the instrument.” Thus, while the manner of opening an account might be considered in the context of all the facts surrounding the paying or taking of a check, the manner of opening an account, by itself, is not a focus of the rule.
In this case, the facts differ materially from the relevant behavior in the comment’s example. In the comment, the employee opens an account for a “well-known national corporation” and deposits a check for a “very large amount of money.” After the account is credited, the money is transferred out of the account. I.C. § 26-1-3.1 — 405 cmt. 4. While we may quibble about whether Auto-Owners is a sufficiently well-known national corporation,[3] the vast majority of the checks Wulf deposited were worth well under $10,000[4] and deposited over a period of almost eight years. Many checks had been deposited by the time Auto-Owners noticed a problem. Because “[a]ny cause of action Auto-Owners may have had accrued at the time each check was negotiated by Wulf,” Auto-Owners Ins. Co., 852 N.E.2d at 612, a connection between the individual checks currently at issue (those not excluded by the statute of limitations) and the manner of the opening of the account five years before is minimal. Under these circumstances, Auto-Owners may not argue that the opening of the account in 1991 is included in the “context of all the facts relating to ... the bank’s collection of the check[sj,” I.C. § 26-1-3.1-405 cmt. 4, after October 30, 1995.
The Court of Appeals has correctly analyzed whether Bank One exercised ordinary care in taking and paying the checks proffered by Wulf after October 30, 1995, in Auto-Owners’s name, and found that it did. The language of the statute does not contemplate a general requirement that banks use ordinary care when opening accounts, and Auto-Owners does not raise *1091 this question again in the context of the paying and taking of instruments in its Petition for Transfer. Auto-Owners Ins. Co., 852 N.E.2d at 616-18.
II
Even if Bank One did not demonstrate ordinary care in its acceptance of the checks proffered by Wulf, Auto-Owners must still show that such a lack of ordinary care “substantially contributed” to its losses. The comments to I.C. § 26-1-8.1-406 explain the test:
The “substantially contributes” test of former Section 3-406 is continued in this section in preference to a “direct and proximate cause” test. The “substantially contributes” test is meant to be less stringent than a “direct and proximate cause” test. Under the less stringent test the preclusion should be easier to establish. Conduct “substantially contributes” to a material alteration or forged signature if it is a contributing cause of the alteration or signature and a substantial factor in bringing it about. The analysis of “substantially contributes” in former Section 3-406 by the court in Thompson Maple Products v. Citizens National Bank of Corry, 211 Pa.Super. 42, 234 A.2d 32 (1967), states what is intended by the use of the same words in revised Section 3-406(b). Since Section 3^404(d) and Section 3-405(b) also use the words “substantially contributes” the analysis of these words also applies to those provisions.
I.C. § 26-1-3.1-406 cmt. 2. White & Summers defines the “substantially contributes” standard expansively: “The, acts sufficient to ‘substantially contribute’ to a material alteration or to the making of an unauthorized signature are limited only by man’s capacity for slovenly business transactions.” White & Summers, supra, § 19-3(b). We do not interpret the standard quite as broadly as White & Summers does in the examples that follow this summary, though we agree that those examples may contribute to a party’s meeting the “substantially contributes” test. Rather, we look to Thompson Maple Products, which is cited in the second comment to § 406. There, the court followed a chain of company practices that allowed forgery to flourish, and then held:
While none of these practices, in isolation, might be sufficient to charge the plaintiff with negligence within the meaning of § 3-406, the company’s course of conduct, viewed in its entirety, is surely sufficient to support the trial judge’s determination that it substantially contributed to the making of the unauthorized signatures.
Thompson Maple Products, Inc., 211 Pa.Super. 42, 234 A.2d 32, 36 (1967) (emphasis added).
Thus, to determine whether conduct has substantially contributed to a loss, we follow the second comment to § 406 and ask whether the opening of the bank account was (1) a contributing factor to Auto-Owners’s loss and (2) whether the opening of the bank account was a substantial factor in bringing the loss about. I.C. § 26-1-3.1-406 cmt. 2. Like the court in Thompson Maple Products, we will view the conduct of Bank One “in its entirety.” 234 A.2d at 36.
Wulf opened an account with Bank One in 1991 and began depositing checks meant for Auto-Owners. Wulfs deception was not discovered for almost eight years. Other than the lack of procedure used in opening the bank account in 1991, Bank One appears to have followed required protocol in depositing checks from Wulf. See Auto-Owners Ins. Co., 852 N.E.2d at 612-16. Even if we assume that Bank One’s conduct in opening the account was a contributing factor to Auto-Owners’s loss, and meets the first part of the “substantially contributed” test, we agree with the trial court and the Court of Appeals *1092 that Bank One’s conduct was not a substantial factor in bringing that loss about under the second part of the test. In other words, when viewed in its entirety Bank One’s conduct does not meet the “substantially contributed” test. See Thompson Maple Products, 234 A.2d at 36. Indeed, it appears that Auto Owners was the substantial contributor to its own losses, particularly those at issue here, with its less than rigorous monitoring of its files and incoming checks.
For the reasons addressed above, we affirm the trial court’s determination that summary judgment for Bank One was appropriate in this case. There is no disagreement between the parties as to the material facts of the case. We agree with the trial court’s determination that Bank One was entitled to summary judgment and that Auto-Owners is not entitled to a trial under § 405. We express no opinion as to whether Auto-Owners might have been able to demonstrate Bank One’s negligence under another law, regulation, or the common law.
Conclusion
For the foregoing reasons, we affirm the trial court. The issues not addressed in this opinion, but addressed by the Court of Appeals, are summarily affirmed pursuant to App. R. 58(A).
SHEPARD, C.J., and RUCKER, J., concur.
BOEHM, J., dissents in part with separate opinion in which DICKSON, J., concurs.

. In this context, “subrogation” is "[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy.” Black’s Law Dictionary 1467 (8th ed.2004). “Salvage” is "property saved or remaining after a ... loss, sometimes retained by an insurance company that has compensated the owner for the loss.” Id. at 1367.

. After the events of September 11, 2001, the nation changed the way it thinks about the potential dangers of undocumented parties opening new bank accounts. See, e.g., 31 U.S.C. § 5311 (Supp. II 2002) (amended by USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 1, 115 Stat. 272, 326 (2001), to expand purpose of subchapter requiring access to financial records beyond criminal, tax, and regulatory investigation of money laundering to include intelligence and anti-terrorist efforts). However, Wulf opened his account in 1991.

. Auto-Owners's website indicates that it has been doing business in Indiana since 1935. By 1991, it was doing business in 19 states. Auto-Owners Insurance Corporate Information, History, http://www.autoowners.com/ Default.aspx?tabid=102 (last visited Jan. 24, 2008).

. This is not to say that an amount over $10,000 is necessarily a "very large amount of money” for purposes of interpreting this example. However, it is instructive to note that Auto-Owners viewed that amount as one up to which employees might settle unsupervised: Wulf stated that he had authority in his position to settle a claim on behalf of Auto-Owners for up to $10,000 without consultation with a superior. Indeed, Wulf suggested that the amount might have gone up to $20,000 at one point.