CORNER STONE BANK VS RHODES ET AL.

Opinion delivered October 19, 1904.

1. *Bills and Notes—Sureties—Forgery—Ratification—Estoppel.*

Where a maker of a note signed the names of two others thereto, wholly without authority, but they, after being notified thereof by the payee, failed to repudiate the same until after the maturity of the note and the death of the principal hopelessly insolvent, such facts *Held*, sufficient to constitute a ratification and estop them from setting up forgery as a defense.

Appeal from the United States Court for the Northern District.

JOSEPH A. GILL, Judge.

Action by the Corner Stone Bank against William Rhodes and others. Judgments for defendants. Plaintiff appeals. Reversed.

This action was brought by the appellant against the appellees on a promissory note dated July 1, 1901, for $900 and interest, due January 1, 1902. The note purported to have been signed by one John W. Ward and the three defendants, William Rhodes, J. C. Welch, and John Clark. Ward, having died before the commencement of the action, was not joined in the suit. The defendants, in their answer, deny the execution of the note by them, and allege that, if their names appeared to it, they were forged. Verdict for the plaintiff as against William Rhodes, and for the defendants as to the others. Motion for new trial filed, overruled, exceptions saved, and cause regularly appealed to this court.

*W. H. Kornegay*, for appellant.

*Preston S. Davis*, for appellees.

CLAYTON, J.   That the note sued upon was not signed by the defendants Welch and Clark sufficiently appears from the proof. Their names had been signed to it by Ward, who was a son-in-law of Welch. The real consideration of the note was the retirement of another note, for $750, with interest, then four months past due, with the difference in money between the amount due on that note and the $900 note sued on in this case. This first note was signed by Ward and Welch as makers, Clark's

(18)

name being put upon it, with his consent and by his direction, by Ward, who was the real borrower; the others being sureties. In the execution of this new note, it seems that Ward, after signing his own name to it and procuring Rhodes to sign it, without the knowledge or consent of Welch and Clark, wrote their names to it, immediately under his own and Rhodes', and sent it by mail to the plaintiff bank. The old note was canceled and returned to Ward, with the additional money necessary to make up the $900 embraced in the new note. Within a few days thereafter the bank, by its cashier, wrote to Welch a letter informing him of the transaction, and that his name and that of Clark were upon the paper. Upon the receipt of this letter, Welch saw Clark, and talked to him about it. The two then went to see Ward. Welch's testimony on this point is as follows: "Q. When did you first get notice there was such a note as this in existence, claimed that—in which they claimed that you had signed it? A. I believe, sir, the first that I ever knew anything about it was some time in the last of June or the first of July, in the summer before John died, in the summer before John died the next spring—I believe, in 1891; to the best of my recollection, would be in 1891— Q. 1902? A. 1902; and in the summer in July—last of June or the first of July—I got a notice from Mr. George Smith, notifying me that there was such a note in existence; and I went to see Uncle John Clark, and asked him about it, and he knew nothing of it, and I knew nothing of it; and he came to see John Ward about it, and asked him if there was any such note in existence, and what it was, and the reply was that he—He replied to me. He said, 'That's all right.' He said, 'I will fix that all right.' He said, 'I have got notes enough in the bank put up against this to pay it off.' Q. What, if anything, did you do towards replying to this notice—you and Mr. Clark? A. I didn't do anything except go and tell John, and John went himself, or at least he told me he went. Q. What did he say after he went? A. He came back and told

me he had fixed it, or settled it, or fixed it off some way.  He said, 'I have got it fixed'—is the words John told me.  Q.  What did you say to John, if anything, in this conversation, as to whether or not you had signed this note?  A.  I told John I had never signed it.  Q.  What did John say?  A.  He ·didn't say anything, any more than he said, 'That's all right.'  That's all the reply he made to me.  * * *"  Cross-examination:  "Q. You say you got a notice in the summer before John died the next spring, letting you know that this note was in existence? A.  Yes, sir.  Q.  You never replied to those people at all, did you?  A.  No, sir."  The witness is evidently mistaken in putting the date of the reception from the bank of the notice on the last of June or first of July, 1902.  This suit was filed April 18, 1902, and the witness himself says that it was in the summer before the spring that John Ward died, which was the spring of 1902.  Clark, in his testimony, puts the date as being in the summer of 1901, which was unquestionably the time, and this was the date the note was executed.  Neither of them replied to the letter, or otherwise gave the bank any information that they had not signed the note, or had not authorized it to be done, until after the paper became due, and a demand was made upon them for payment.  In the meantime Ward had died, hopelessly insolvent.

We are of the opinion that, under the facts and circumstances of the case, the defendants Welch and Clark, upon being notified by the bank, so soon after the execution of the note, of the fact that their names were upon it, should have promptly and at once given notice of their repudiation of the act of Ward in putting their names to the paper.  They were on the original note, which was four months past due and unpaid.  It was their duty to see that it was paid.  They were expecting Ward to look after it.  They were interested in seeing that it was taken care of.  There was such a mutuality of interest between them

that one might well look after it for all. And this is what Ward did. He took up the old note by executing a new one, to which, without authority, it is true, he put the names of Welch and Clark. But their names were on the old note, and they were immediately notified of the transaction. In their previous dealings when the old note was executed, Clark's name was, by authority, signed by Ward, and Welch was Ward's father-in-law. Had it been a bald, naked forgery, without any relation to their mutual interest and to the past dealings with the bank, they might possibly be excused for their remarkable silence when notified of the conditions; but, under the circumstances of this case, the law will hold their silence as conclusive proof of ratification. It is a maxim of the law that "he who remains silent when, in conscience, he ought to speak, will be debarred from speaking when, in conscience, he ought to remain silent." And as to forgery, Mr. Mechem, in his work on Agency (section 116), says: "But whatever may be regarded as the true rule in the abstract, it is certain that the principal may, upon the discovery of the forgery, so conduct himself, as by permitting the paper to be taken upon the strength of his assertion of its genuineness, or by inducing the holder to change his position or intermit some remedial proceeding upon an assurance of its validity or a promise of protection, or, generally, by remaining silent as to its invalidity, when, in equity and good conscience, he ought to have spoken, as to estop himself from asserting that it is not binding upon him." The same authority (sections 154, 155) says: "A principal, upon being informed of the unauthorized act of another in his behalf, has the right to elect whether he will ratify or repudiate the act. And this right of election belongs in the first instance to him alone, and, so long as the condition of all parties remains unchanged, he cannot be prevented from ratifying because the other party may for any reason prefer to treat the act as invalid. And even though at first he may disapprove, he may afterwards, if the condition of all parties remains unchanged,

elect to give confirmation to the act.    But where the rights and obligations of third persons may depend on his election, it is obvious that he is bound to act, or suffer the necessary consequences of his inaction, and that if, after knowledge, he remains entirely passive in regard to the transaction, it is but just, when the protection of third persons may require it, to presume that, what upon knowledge he has failed to repudiate, he has at least tacitly confirmed.    If, therefore, he would escape responsibility for the act, he must give notice of his nonconcurrence.    The time within which this notice is to be given has not been settled with absolute harmony by the courts.    Many cases hold that the principal is bound to act at once upon receiving knowledge, but the better rule, and the one supported by the majority of the authorities, is that, if the principal desires to repudiate the transaction, he must give notice thereof within a reasonable time after becoming fully informed, and that, if he does not so dissent, his silence will afford conclusive evidence of his approval. What shall be deeemd to be a reasonable time depends   *   *   * upon the situation of the parties and the facts and circumstances of the case."    Mr. Reinhart, in his work on Agency (section 121), says:    "Implied Ratification—Intention.    But the most common instances of ratification are those arising by implication from the conduct of the supposed principal.    The ratification of an act is but a retroactive grant of authority, and this, as we have seen, may be effected in the same manner as the granting of authority prior to the act.    Hence, as the delegation of authority may be proved by circumstances from which an inference may be drawn that such authority had in fact been bestowed, an inference may likewise be gathered from circumstances from which the ratification is commonly implied, or the acts and conduct of the principal with reference to the transaction performed for him.    One who conducts himself in such a manner as to lead an ordinarily prudent man to believe, to his prejudice, that an act, though done without authority, has received the approval of

him for whom it was performed, cannot, in justice and good conscience, be permitted to say that he really never assented to the act, or that he did not intend his words and conduct to have the effect of such assent. It is not material, therefore, what the actual intention of the ratifying party may have been, as to whether he would affirm the act or reject it. The old and familiar rule that a person must be held to have intended the natural and ordinary consequences of his act is fully applicable; and if his language, his silence, or his acts were such as would naturally cause another to believe that he had assented, and to act upon such belief, it will be conclusively presumed that his intention was consistent with his conduct, and he will be held responsible, the same as if he had manifested his assent by express ratification."

If it shall be said that the principle of ratification or estoppel does not apply in this case, because the bank may still proceed to sue on the old note, and therefore the making of the new note was not to its prejudice, the answer is that the making of the new note has changed the conditions to the injury of the bank. The time of payment was continued six months, and Ward has since died, leaving an insolvent estate. And reading between the lines of Welch's and Clark's testimony, and observing the strenuous efforts of their counsel to keep from the jury all knowledge of the old note, and of the intentions of his clients as to the payment of it, it is evident that the plaintiff is to be driven to the expense and annoyance of another suit. And, besides, there went into the new note $100 or more that was not embraced in the old one, and which was an entirely new and independent consideration, for which the sureties on the old note are not bound; and, Ward having died insolvent, the plaintiff must necessarily look alone to the sureties on the new one for payment. If that sum cannot be collected from these sureties, it cannot be collected at all, and the bank will sustain a loss of

the whole of it; and therefore, as to that part of the consideration, the case is brought fairly within the rule that "the acts claimed to effect a ratification must be of such a nature that the right of the other party, who has relied upon them, will be prejudiced if a ratification has not taken place." Mechem on Agency, § 131. And: "It is a fundamental rule that, if the principal elects to ratify any part of the unauthorized act, he must ratify the whole of it. He cannot avail himself of it so far as is advantageous to him, and repudiate its obligations; and this rule applies not only when his ratification is express, but also when it is implied." Mechem on Agency, § 130. In this case the facts which, in law, constitute a ratification of the act of Ward in signing the names of the defendants Welch and Clark to the note being admitted by them, they are undisputed, and, "when the facts are undisputed, the question whether or not they amount to a ratification is one of law for the court." Mechem on Agency, § 135. In our opinion, it was the duty of the court below to have peremptorily charged the jury to find their verdict for the plaintiff for the full amount of the note, with interest.

Reversed and remanded, with directions to the court to grant a new trial.

RAYMOND, C. J., and TOWNSEND, J., concur.