West Penn Administration, Inc., et al., Appellants, *v.* The Union National Bank of Pittsburgh.

312

314

316

Argued November 15, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*B. A. Karlowitz,* with him *John P. Papuga, Henry S. Pool,* and *Tucker, Arensberg & Ferguson,* for appellants.

*Robert F. Patton,* with him *Stephen A. George, Warren W. Ayres, Clayton A. Sweeney,* and *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for appellee.

Opinion by Price, J., March 31, 1975:

This appeal raises four issues, all of which concern the Commercial Paper[1] and Bank Deposits and Collections[2] chapters of the Uniform Commercial Code, as they apply to the payment of a check on a forged indorsement.

Appellant, West Penn Administration, Inc., ("West Penn"), a non-profit corporation,[3] brought this suit in trespass, on a theory of conversion, against the Union National Bank of Pittsburgh ("UNB") to recover the proceeds of 122 checks deposited with forged indorsements in UNB. UNB filed Preliminary Objections. West Penn amended its complaint by listing as additional plaintiffs eighteen separate welfare and pension trusts and unincorporated labor associations whose funds were represented by the 122 checks. UNB filed Preliminary Objections to the Amended Complaint alleging that Pittsburgh National Bank ("PNB") was the real party in interest. The lower court sustained the Preliminary Objections and required that West Penn obtain PNB's right, title and interest, if any, in the 122 checks and proceeds. West Penn filed the Second Amended Complaint, in the name of West Penn and the trustees of 21 pension and welfare trusts and unincorporated labor associations, to which UNB filed an Answer and New Matter denying liability. Appellant filed a Reply to New Matter, and the case pro-

---

1. Act of April 6, 1953, P. L. 3, §3-101, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-101) et seq.

2. Act of April 6, 1953, P. L. 3, §4-101, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §4, eff. Jan. 1, 1960 (12A P.S. §4-101) et seq.

3. West Penn Administration, Inc., manages trust funds payable under certain collective bargaining agreements. Its functions include collecting and managing contributions from employers due under the agreements. West Penn acts on behalf of some 32 separate pension and welfare trusts and unincorporated labor associations, including those named as plaintiffs in the Second Amended Complaint.

ceeded to trial,[4] with West Penn excepting to the finding that PNB was the real party in interest.

A verdict in favor of West Penn and against UNB was entered on October 11, 1972, requiring UNB to deliver to West Penn all the assets which UNB recovered from the forger, John F. Miller, or others, and all increments thereto as a result of investment or sale. The verdict was not in the form of a fixed dollar amount.[5]

Following the denial of post-trial motions, West Penn filed this appeal, seeking an amendment of the judgment to permit a recovery of its entire loss from UNB. Appellant contends that the lower court erred in finding that PNB was the payee of the checks; that PNB and West Penn substantially contributed to the forged indorsements by their negligence; that UNB acted in a commercially reasonable manner in accepting the checks for collection; and that PNB was estopped from denying the unauthorized indorsements by reason of its payment of the checks.

The facts, as found by the lower court, follow:

Certain employers engaged in the construction industry entered into a collective bargaining agreement with union representatives of their employees. The agreement required the employers to contribute money to trustees of certain pension and welfare trusts, created for the benefit of their employees. It also required the trustees to invest the contributions and to pay the increments from investments, less administrative expenses, into the trust corpus. In accordance with the trust agreements, the trustees later dispersed funds from the trust to eligible employees.

---

4. The case was tried before the Honorable Robert A. Doyle and a jury. However, following the close of the evidence, the parties agreed to submit the issues to Judge Doyle without a jury. In accordance with a pre-trial order, all questions of warranty were removed from the case.

5. To date, UNB has recovered and delivered to West Penn or its bonding agent $390,187.20 in cash and other interests.

As part of the agreement, the employers decided to create "Employer Contribution Reports" periodically. The reports list the names of each employee (union member) who is eligible as a beneficiary of the trust, the number of hours the employee worked during the reporting period, the dollar amount due by the employer for each employee, and the aggregate sum due. The reports, accompanied by the employers' checks in the aggregate amount are delivered by the employers to appellant, West Penn, the manager of the funds. Approximately 90 per cent of all checks written by employers were mailed directly to West Penn's offices. The remaining ten per cent were sent to PNB, the collecting bank, but were re-delivered to West Penn for processing.

West Penn was created by the employers and the unions for the purposes of receiving and processing the Employers' Contribution Reports and accompanying checks, and of managing the trust funds. West Penn also verifies the correctness of each Employer Contribution Report by field audits and pursues employers who fail to pay sums of money found to be due.[6]

Pursuant to its authority as manager of the trust funds, West Penn established four employer contribution accounts with PNB in 1964, by trades. They are: Laborers Contribution Account, Carpenters Contribution Account, Teamsters Contribution Account and Operating Engineers Contribution Account.

West Penn deposited all checks it received from the employers with PNB for credit to one of these four accounts, after having processed the checks at the West Penn offices. The procedure employed by West Penn in handling the checks follows:

Employer Contribution Reports and accompanying checks are received by West Penn's mailroom employees,

---

6. For example, an employer who sends the report to West Penn but neglects to enclose the check in the aggregate sum due, is contacted and requested to make payment.

who then distribute the reports and checks to Reports Department clerks. In the Reports Department, the mathematical correctness of the reports and checks is verified, the checks are bundled and delivered to PNB, and the reports are delivered to keypunchers who prepare computer input cards. Although the dollar amount received is credited to each employer account at West Penn, the information is not recorded in a journal but is instead stored in the computer memory bank.

Some Employer Contribution Reports received by West Penn are not accompanied by checks. Each of these reports is stamped "Report Without Payment" by an account auditor before it is delivered to the keypunch clerks. Again, the clerks prepare computer input cards, but these cards indicate the amount *due* by the employer, and when fed into the computer, generate an account receivable. West Penn then pursues the delinquent employer to collect the sum due, and when it is received, creates a "Journal Voucher" indicating the amount paid. When this information is put into the computer, the former accounts receivable stored in the data banks are erased.

The system employed by West Penn enabled one of its employees, an account auditor and experienced bookkeeper named John F. Miller, to divert employer contribution checks to his own use. He devised the following scheme:

When mailroom employees sent Employer Contribution Reports with accompanying checks to Mr. Miller, he embezzled the checks and stamped on the reports: "Report Without Payment." As to each report so stamped, a false account receivable was generated and stored in the computer. Later, he completed a journal voucher indicating that a check for the amount due, as shown on the Report marked "Report Without Payment," had been received by West Penn. Miller then delivered that journal voucher to the keypunchers, who prepared an input card

which erased the false account receivable "due" from the affected employer.[7] Miller then destroyed the false journal voucher. His next step was to type a forged indorsement on the obverse side of the check, add "For Deposit Only to a/c Union National Bank # [——],"[8] and deposit the check in that account.

The employer contribution checks were drawn to the order of "Pittsburgh National Bank Carpenters[9] Contribution Account." On certain checks, the words "Carpenters Contribution Account" appeared on a line beneath the words "Pittsburgh National Bank." On others, the account name appeared on the same line, but following, the bank name.[10]

---

7. Neither PNB, the intended depositary bank, nor the trustees of the trust funds would notice changes in the contributions, because the amounts due fluctuated in direct ratio with the volume of business in the construction industry. No employer would suspect Miller's deception since West Penn's auditors would not learn of an amount due (the computer memory having been erased) and consequently would not request payment from him.

8. The checks were deposited to one of four accounts at UNB, established by Miller's part-time employer. Miller obtained the use of these accounts by advising his employer that he was the beneficiary of the estate of a deceased wealthy benefactor, that he had no bank account, and that he desired to process through the accounts checks which he would be receiving from time to time from the executors of that fictitious decedent's estate. His employer, ignorant of Miller's scheme, acquiesced and permitted Miller to use his pre-printed deposit slips bearing the account numbers, and bank checks bearing the holographic signature of an agent authorized to draw funds from the accounts at the UNB Branch Bank at Aspinwall.

9. "Carpenters" is used throughout this Opinion to refer to any or all four unions involved in this litigation. The others are Laborers, Operating Engineers and Teamsters.

10. The lower court found this difference in drafting the checks immaterial to its determination that PNB was the payee of the checks and that the Trustees of the trusts represented by these four accounts were not the payees.

When Miller presented his first forged check to the UNB teller, he told the teller that the maker of the check had made it out to the wrong payee. The teller wondered if the indorsement was correct, asked one of her superiors, received approval, and processed the check. The additional 121 forged checks were deposited in a similar fashion. UNB accepted all such checks (in a total of fifteen transactions) because the first and all subsequent checks were paid without question. Once the checks had cleared, Miller wrote in his name as payee on his employer's check,[11] withdrew the funds from the UNB accounts, and deposited them in his own savings accounts maintained in other banks. Later, he withdrew funds from the savings accounts and invested them. The total amount of money Miller diverted to his personal use through his scheme was $444,527.57.

Miller fell ill shortly after he began to forge the indorsements, and did not work for three months. During that time, a chief officer at West Penn learned of the apparent discrepancy in the employer account for which Miller had made the first false journal voucher. The fictitious voucher was located and examined, but no investigation was conducted to find the cause of the discrepancy. Thus, West Penn had the opportunity to prevent the next 121 forgeries, but failed to do so.

Approximately eight months after Miller deposited the first check, West Penn inadvertently discovered the fraud while investigating an employer account which was not related to Miller's transactions. Miller was not suspected, but thought he was, and fled to Oklahoma. Shortly thereafter, he surrendered himself to the FBI and subsequently pled guilty to criminal charges.[12]

Upon receipt of notice of Miller's frauds, UNB successfully garnished Miller's assets held by banks in the

---

11. *See* Note 7, *supra.*

12. Miller is now employed by the Commonwealth in the Department of Welfare.

City of Pittsburgh. UNB recovered $390,187.20 worth of cash, proceeds, stock, unliquidated claims, bonds, and other interests.

## I

We are first asked to determine whether the lower court correctly found PNB to be the payee of checks deposited in the four contribution accounts established by West Penn at PNB. Appellant contends that the trustees of the money in the accounts were the payees, and thus the real parties in interest. UNB asserts that PNB, the depositary bank, was the payee and, therefore, the real party in interest.

The conflict in viewpoints centers around the lower court's application of §3-117[13] rather than §3-110 (1) (e)[14] to the facts of the case. Section 3-110(1) (e) provides: "(1) An instrument is payable to order when by its terms it is payable to the order or assigns of any person therein specified with reasonable certainty, or to him or his order, or when it is conspicuously designated on its face as 'exchange' or the like and names a payee. It may be payable to the order of . . . (e) an estate, trust or fund, in which case it is payable to the order of the representative of such estate, trust or fund or his successors . . ." Section 3-117 provides: "An instrument made payable to a named person with the addition of words describing him (a) as agent or officer of a specified person is payable to his principal but the agent or officer may act as if he were the holder; (b) as any other fiduciary for a specified person or purpose is payable to the payee and may be negotiated, discharged or enforced by him; (c) in any

---

13. Act of April 6, 1953, P. L. 3, §3-117, eff. July 1, 1954. Reenacted Oct. 2, 1959, P.L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-117).

14. Act of April 6, 1953, P. L. 3, §3-110, eff. July 1, 1954. Reenacted October 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. 3-110(1) (e)).

other manner is payable to the payee unconditionally and the additional words are without effect on subsequent parties."

The dispute concerns the words "Carpenters Contribution Account" which are written after the words "Pittsburgh National Bank" on the space provided for naming the payee of the instrument. UNB contends that the account name is mere description under §3-117 and, therefore, of no significance in identifying the payee. In response, West Penn contends that the account name specifies a fund under §3-110(1)(e). The lower court agreed with UNB, and stated: "Under UCC §3-117(c), *supra*, once the 'named person' to whom a check is made payable has been identified, words describing the payee's relationship to others or indicating disposition by the payee of the *proceeds* of a check (*e.g.*, 'Carpenters Contribution Account') are 'without effect on subsequent parties,' *e.g.*, endorsees or depositary, collecting or payor banks."

In furtherance of its argument, appellant asserts that all parties to the transaction which established the contribution accounts intended the payees to be trustees of the funds in the accounts. Consequently, appellant maintains that making checks payable to "Pittsburgh National Bank Carpenters Contribution Account" both complied with Section 3-110(1)(e) and carried forth the intention of the parties. Appellant's argument, however, is not consistent with the language of the agreement which established the accounts, and is contrary to prior cases which have dealt with questions of title to instruments sent to banks for collection.

The relevant portions of the agreement[15] establishing the Laborers Contribution Account follow: "RESOLVED, that PITTSBURGH NATIONAL BANK is hereby desig-

---

15. Identical agreements, but bearing different account numbers, were entered into to establish each of the other three accounts previously described.

nated a depository of this organization and is hereby authorized *to accept for deposit to the credit of this organization in a clearance account,* in which funds of other similar organizations are also deposited designated 'LABORERS CONTRIBUTION ACCOUNT' bearing No. 1 116435, monies, checks, drafts, notes, acceptances or other evidences of indebtedness payable to this organization in its name or under some variation thereof or to the above identified account, which may now be in or may hereafter from time to time come into, its possession. "RESOLVED, that *the bank* until otherwise ordered in writing *is authorized and directed to make payments* periodically from the funds on deposit with it in the above identified account upon the written distribution orders drawn by WEST PENN ADMINISTRATION INC., when signed by any one of the following officers of said corporation. . . ." [Emphasis added] [NT 1542a]

The agreement which established the accounts clearly created a creditor-debtor relationship between the trustees of the account funds and PNB, the depositary bank. Testimony established that pursuant to the agreement and consistent with the creditor-debtor status, PNB took the check, draft or other negotiable instrument and credited it to the appropriate contribution account. Later, upon receipt of a written order from West Penn, PNB distributed the accumulated proceeds of the funds by affixing its signature to the checks. In practice and at the direction of West Penn, the contribution accounts' indorsement stamps were kept at PNB and affixed to the checks by PNB's employees along with PNB's indorsement. However, indorsement by the account was not necessary to further negotiation of the checks. In addition, appellant's own three expert witnesses testified that in their opinions, PNB was the payee of the checks.

The finding of the lower court that PNB is the payee and that the words "Carpenters Contribution Account" are merely words of description under §3-117(c) is sup-

ported by the language of the agreement and other evidence in the case.

The case law in Pennsylvania also supports the position taken by the trial court. The Pennsylvania Supreme Court has stated: ". . . 'The rule supported by the very decided weight of authority is that a deposit of a check, draft or other commercial paper in the ordinary course of business, whereby the depositor receives a credit as cash against which he may draw, *prima facie* operates to transfer the title to the bank, in the absence of a usage or custom, or of an agreement that the effect of the transaction shall be otherwise, or proof of circumstances from which such an agreement may be inferred.'" *Badler v. L. Gillarde Sons Company*, 387 Pa. 266, 270, 127 A.2d 680, 683 (1956),[16] citing 5A Michie on Banks and Banking, §32a (1952). Earlier, pre-Code cases held that one who holds a negotiable instrument for collection has sufficient title to warrant a suit in his own name. *See Pennsylvania Company for Insurance on Lives & Annuities v. Skelly Bolt Company*, 106 Pa. Superior Ct. 515, 163 A. 328 (1932). *Cf. Farmers Deposit National Bank v. Penn Bank*, 123 Pa. 283, 16 A. 761 (1888).

As the payee of the checks, and consistent with Rule 2002 of the Pennsylvania Rules of Civil Procedure, PNB is the real party in interest entitled to bring suit. Rule 2002 provides in pertinent part: "(a) Except as otherwise provided in clauses (b), and (c) and (d) of this rule, all actions shall be prosecuted by and in the name of the real party in interest, without distinction between contracts under seal and parol contracts. (b) A plaintiff may sue in his own name without joining as plaintiff or

---

16. Section 4-201 (1) which raises the rebuttable presumption that the collecting bank is the agent of the owner [payee] of an item until final settlement is made has no import in this case. Settlement was finally made when the forged checks cleared the collection process and were returned to their makers. *See* §4-213 and §3-418.

use-plaintiff any person beneficially interested when such plaintiff (1) is acting in a fiduciary or representative capacity, which capacity is disclosed in the caption and in the plaintiff's initial pleading; or (2) is a person with whom or in whose name a contract has been made for the benefit of another. . . ."

In the instant case, PNB is the "person with whom a contract [agreement] has been made for the benefit of another [the trustees of the contribution accounts and union members entitled to a distribution]." Although the trustees of the accounts have a beneficial interest in the proceeds of the checks, that interest is not sufficient to entitle them to maintain an action against UNB in their own names. *See Spires v. Hanover Fire Insurance Company*, 364 Pa. 52, 70 A.2d 828 (1950), wherein the court noted that the real party in interest is the person who has control over an action brought to enforce rights, and not necessarily the person who may ultimately be entitled to the benefit of any recovery obtained, nor the person beneficially interested in the outcome.

The lower court correctly required West Penn to obtain an assignment of PNB's interests in order to prosecute this action. The court was also correct in stating at note 17 of its opinion: "However, they [trustees and beneficiaries of the trusts and accounts] *may*, under the Union contracts, have a right to demand payment from the Employers, who, upon payment, *may* have rights against their drawee banks." The rights of those beneficially interested in the account funds are, therefore, adequately protected.

## II

We are next asked to consider whether the lower court erred in finding that West Penn, as assignee of PNB, was precluded from asserting the Miller forgeries against UNB. The lower court held that PNB and West Penn, through negligence, substantially contributed to the mak-

ing of the unauthorized signatures, and concluded that Section 3-404[17] operated to estop and otherwise preclude appellant's denial of the forged indorsements.

Section 3-404 provides: "(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value. (2) Any unauthorized signature may be ratified for all purposes of this Article. Such ratification does not of itself affect any rights of the person ratifying against the actual signer."

Comment 4 to §3-404 states that the words "or is precluded from denying it" are retained in §3-404 (1) " . . . to recognize the negligence which precludes a denial of the signature." Such negligence is the subject matter of §3-406 :[18] "Any person who by his negligence *substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature* is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." [Emphasis added]

Comment 7 to §3-406 indicates that the section applies to situations in which ". . . the party has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person. It extends to negligence which contributes to a

---

17. Act of April 6, 1953, P. L. 3, §3-404, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-404).

18. Act of April 6, 1953, P. L. 3, §3-406, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-406).

forgery of the signature of another . . ." The comment continues: "As in the case of alteration, no attempt is made to specify what is negligence, and the question is one for the court or the jury on the facts of the particular case." The lower court found that West Penn and PNB substantially contributed to the making of an unauthorized signature through negligent handling of the checks sent by employers for deposit in the contribution accounts, and through PNB's negligence in failing to recognize that its indorsement on the 122 checks involved in this action was forged. These findings are supported by the credible evidence.

In 1964, officers of PNB and West Penn established procedures for receiving and processing employer contributions. The plan as adopted, required employers to make their contributions by checks payable to PNB. However, the checks were to be delivered to West Penn— not to PNB, the payee. This system was chosen despite West Penn's admission that it was aware of the availability of a "lock-box" system, in which checks would be delivered to a locked post office box. The box would be opened by PNB, whose employees would process the checks and send the reports accompanying the checks to West Penn for data processing. A finding that both PNB and West Penn were negligent in failing to use the lock-box system is amply supported in this record.

Furthermore, the procedure employed by West Penn upon receipt of the checks was negligently enforced. The envelopes containing the checks and reports were received in the mailroom of West Penn. The envelopes were opened by mailroom clerks, but no record of the contents was kept. Instead, the contents were delivered to the Reports Department, where clerks separated the checks from the reports, and entered the amounts of the checks on an adding machine tape. However, no list of the employers or their contributions was kept. The checks were then sent to PNB, and the reports to West Penn's

data processing center where the information was fed into the computer, as previously described.

West Penn may have been able to avoid the problem which arose in this case by employing a sophisticated accounting system. However, West Penn used a single entry accounting system to record its cash even though its chief administrative officer, a certified public accountant, knew that this was an inferior control procedure. No record was maintained, nor was any comparison made, of the total contributions reported by employers or of the dollar amounts actually received by West Penn and forwarded to PNB for deposit to the contribution accounts.

Other evidence of negligence is found in the use of the journal vouchers described previously. West Penn's monthly account receivable reports were affected by non-cash entries fed into the computers as adjustments, by means of journal vouchers. Vouchers were photocopied in West Penn's offices. They were unnumbered and accessible to any employee. West Penn neither created nor maintained any record of credits entered by journal vouchers and, therefore, had no method to cross-check the accuracy or validity of the credits.

West Penn's office procedure manual required that vouchers be initiated only by the office manager. The manual also required the manager to review completed voucher forms and to sign them prior to further processing. The evidence indicates not even occasional compliance with these mandated procedures, and consequently, that the office managers failed to review the entries to determine their validity.

Shortly after the embezzlement of the first check by Miller, the fraudulent voucher, which Miller had inserted into the computer system to cancel the account receivable and conceal the fraud, was discovered by other West Penn employees. A cursory investigation produced no satisfactory explanation for that particular voucher

entry. However, no follow-up inquiry was made: Miller was not seriously questioned about it; the employer was never contacted; and the entry was never justified. Failure to make inquiry was negligence. Had West Penn asked the employer whether he was delinquent, the entire fraudulent scheme would have been exposed and the forgeries prevented.

PNB was also negligent in its handling of checks to be deposited in the contribution accounts. As the payee of all employers' checks, PNB should have required the installation of the lock-box system. Failing that, PNB should have demanded that the checks be delivered to its offices. Instead, when checks were inadvertently sent to PNB, employees of PNB delivered the checks to West Penn for processing. Appellant's brief, at 30, indicates how West Penn obtained possession of checks delivered to PNB: "It was the custom of West Penn employees to stop in the Allegheny Center Branch of PNB (where all of the PNB-West Penn business was transacted) to inquire routinely whether or not the bank had received any checks belonging to West Penn."

Testimony revealed that Miller obtained possession of approximately ten per cent of the stolen checks from PNB's office. If a lock-box system had been used, Miller would not have had access to the checks, nor would he have been able to steal them.

Of the 122 checks involved in this action, 21 were drawn on and made payable to PNB. On 21 separate occasions commencing in October, 1969, a PNB signature verification clerk looked at the PNB signature Miller placed on the checks and did not question its propriety. With a moment's reflection, the clerk would have realized that the check should never have been outside PNB because PNB was both the payee and the drawee of the check. Yet each check bore evidence that it had been transferred from UNB; and this fact, in the absence of negligence, should have prompted further inquiry. PNB's

failure to pursue the inquiry was negligence which substantially contributed to the making of forged indorsements on all 121 checks.

The course of conduct evidenced by PNB and West Penn was more than sufficient to support the lower court's finding of gross negligence.[19] *Thompson Maple Products, Inc. v. Citizens National Bank,* 211 Pa. Superior Ct. 42, 234 A.2d 32 (1967). As a direct and proximate result of the PNB-West Penn negligence, Miller was put into possession of checks, concealed his thefts, and obtained the proceeds on 122 forged instruments.

The lower court also held appellant estopped from asserting the forgeries against UNB. This finding is now disputed. West Penn argues that, as assignee of PNB, it was entitled to rely on UNB's prior indorsement guaranteed stamp. However, as all questions of warranty were removed from the case by agreement, this issue is not properly before us. Moreover, the lower court was correct in its finding that PNB impliedly ratified the forged indorsements by reason of its payment of the checks bearing the indorsements and through its failure to notify UNB of the forgeries and, therefore, was estopped from asserting the forgeries.

The law of estoppel in Pennsylvania is summarized in *Restatement (Second) of Agency* §8B (1958), as follows:

---

19. Judge DOYLE noted that the finding of "gross negligence" was in compliance with *Commonwealth v. National Bank & Trust Company of Central Pennsylvania,* 9 Pa. Commonwealth Ct. 358, 305 A. 2d 769 (1973). We agree with the Dissenting Opinion in that case. We do not believe that this Commonwealth has adopted comparative negligence as a state doctrine, and consequently, that there are no degrees of negligence in Pennsylvania. The evidence in the case before us is sufficient, however, to establish a breach of the duty of due care, and indicates negligence which substantially contributed to the making of the forged instrument. *See Restatement (Second) of Torts* §284 and §431 (1965). *Cf. Land Title Bank & Trust Company v. Cheltenham National Bank,* 362 Pa. 30, 66 A.2d 768 (1949).

"§8B. *Estoppel—Change of Position* (1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if (a) he intentionally or carelessly caused such belief, (b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts."

Comment (c) indicates that silence may give rise to an estoppel: "In many situations one may be deprived of a right of action, be subject to an action or even lose his property by failing to reveal the truth if he knows that another is acting or will act under a misapprehension . . . There may even be liability based on a failure to speak, as where one knows that another is purporting or has purported to contract as his agent or to receive money on a forged instrument, and fails to reveal the facts."

In Pennsylvania, a bank is charged with knowing and recognizing the signatures of its drawer-depositors. *Price v. Neal,* 3 Burr. 1354 (1762). We believe that a bank must also be held to know its own indorsement. *See Trudal v. Western Pennsylvania National Bank,* 121 P.L.J. 421 (1973), in which the court stated that a loss caused by criminal activity (forging drawer's signature) of a third party should fall on the bank best able to detect the fraud in first instance; *i.e.,* the drawee bank, which is charged with knowing the signature of its depositor.

PNB, through its paying clerks, had imputed knowledge that its own indorsements had been forged on 21 items drawn on PNB and 101 items payable to PNB; that the forged indorsements directed payment to a third-party account; and that UNB as depositary bank, guaranteed those indorsements as PNB's genuine signature. Despite this knowledge, PNB paid 21 checks on which its name appeared as drawee and thereby represented that its signature was valid. *See Funds for*

*Business Growth, Inc. v. Maraldo,* 443 Pa. 281, 278 A.2d
922 (1971). The UNB teller who received most of the
embezzled checks from Miller testified, as did others, that
after the first check drawn on PNB had cleared the
collection process without objection, she concluded that
subsequent checks similarly indorsed could also safely
be received for deposit or for collection and deposit. UNB
relied not only on PNB's silence, but on PNB's payment,
and was entitled to honor that form of indorsement on
all of the 122 embezzled instruments. *Cf. Shoemaker's
Account,* 277 Pa. 424, 121 A. 510 (1923).

Having failed in its duty to recognize the fraudulent
indorsement of its signature, PNB was correctly held to
have acted without due care in its capacity as drawee.
Banks and bankers are not exempt from the rules of
estoppel in the Commonwealth. Therefore, PNB was
estopped from denying the authenticity of its signature,
and could not recover from UNB.

As assignee, West Penn's rights in this action rose no
higher than those of its assignor, PNB. *Robert Howarth's
Sons, Inc. v. Boortsales,* 134 Pa. Superior Ct. 320, 3 A.2d
992 (1939). *Cf. Hennebont Company v. Kroger Company,*
221 Pa. Superior Ct. 65, 289 A.2d 229 (1972). Therefore,
West Penn is likewise estopped from asserting the
forgeries against UNB.

### III

Finally, we are asked to determine whether the trial
court correctly found that UNB acted in accordance with
reasonable commercial business standards under §3-406,
when it accepted the forged checks for collection. It is
not disputed that all the checks were regular on the face
and bore the purported indorsement of the named payee.
However, West Penn contends that UNB should have
demanded a holographic signature of one of PNB's
officers and written evidence of the officer's authority to
indorse, before accepting the checks for collection and

deposit to the account number designated on the obverse side.

This argument does not consider §3-401(2),[20] which provides: "A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature."

Comment 2 to §3-401 defines the method in which a signature may be made: "A signature may be handwritten, typed, printed or made in any other manner. It need not be subscribed. . . . It may be made by mark, or even by thumbprint. . . . " *See also* §1-201 (39).

Section 3-402[21] establishes that a signature is an indorsement, when it provides: "Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement." In the instant case, the indorsements were proper, and in the absence of circumstances which put UNB on notice of the forgery, UNB was not required to obtain a second indorsement where the first conformed to the Uniform Commercial Code. *Cf. Thompson Maple Products, Inc. v. Citizens National Bank,* 211 Pa. Superior Ct. 42, 234 A.2d 32 (1967).

Moreover, a formal indorsement was not mandated on these 122 instruments. Section 4-206,[22] which governs transfers between banks,[23] states: "Any agreed method which identifies the transferor bank is sufficient for the

---

20. Act of April 6, 1953, P. L. 3, §3-401, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-401 (2)).

21. Act of April 6, 1953, P. L. 3, §3-401, eff. July 1, 1954. Reenacted Oct. 2, 1959, P. L. 1023, §3, eff. Jan. 1, 1960 (12A P.S. §3-402).

22. Act of April 6, 1953, P. L. 3, §4-206, eff. July 1, 1954. Reenacted Oct. 2, 1959, P.L. 1023, §4, eff. Jan. 1, 1960 (12A P.S. §4-206).

23. In the event of a conflict, the provisions of Article 4 govern those of Article 3. *See* §4-102 (1).

item's further transfer to another bank." All of the checks involved in this case were in the collection process when transferred to UNB as the depositary bank for collection. *See* §4-105(a). While the statutory language of §4-206 is not limited to checks in the collection process, the Comment to that section makes it clear that the section applies to those checks. Under these circumstances, the typewritten indorsement which identified PNB met the requirements of this section.

The lower court's finding that UNB acted in a commercially reasonable manner is also supported by the evidence. An expert witness, Dr. Oscar R. Goodman, testified that in his opinion, based on studies conducted in various American cities including Pittsburgh, the UNB tellers who accepted the forged checks acted reasonably, and in fact did even more than could be expected of an average teller.

Dr. Goodman's conclusions were convincingly supported by the results of a test conducted under his supervision, and introduced at trial to impeach the opinions of West Penn's experts. In conducting the test, eight checks were drawn payable to UNB. Three of the checks were payable to UNB without further description, and five contained descriptive language of an account, like that on the stolen checks, following the payee's name (*e.g.,* "Employees Contribution Account"). The checks were duly indorsed by UNB with a typewritten signature such as Miller used in this case. Like the forged indorsements, these indorsements were restrictive, and directed the deposit of the funds into the account of a party other than the payee. At least one of these checks and a deposit slip of the non-payee party was delivered to tellers in each of the three largest banks in Pittsburgh, one of which was PNB. The results of the test showed that PNB's tellers acted in exactly the same manner as did UNB's in accepting the forged checks. For example, PNB's Oliver Building Office took a check drawn to the

order of "The Union National Bank of Pittsburgh" and deposited it to the account of "Evelyn Wood Reading Dynamics Institute."

Similar results were obtained at other banks. For example, checks drawn to the order of "The Union National Bank of Pittsburgh—Employee Contribution Account" were deposited into the account of "Murray Homecraft of Pennsylvania, Inc." by Mellon National Bank. In no case was any check rejected by any bank.

The experiment indicated that the three largest banks in Pittsburgh act in the same manner when presented with a typewritten indorsement in the name of another bank. All three banks accept the check, stamp it "prior indorsement guaranteed" and deposit it in accordance with the directions (restrictive indorsement) beneath the indorsement. This evidence clearly established a routine practice which is commercially reasonable in the banking field. It also indicated that UNB conformed its operations to the standard practice, and thus, that UNB's acceptance of the forged checks for collection and deposit was commercially reasonable.

A determination of which actions are "commercially reasonable" must be made by the lower court as it resolves conflicting testimony. This court will not overturn findings related to credibility unless there is a clear abuse of discretion involved. *Mamallis v. Millbourne Borough*, 401 Pa. 375, 164 A.2d 209 (1960). We find no abuse in the instant case.

IV

In holding that UNB was liable to West Penn in conversion to the extent of the cash and other assets UNB had recovered as a result of its fraudulent debtors attachment action, the lower court took into consideration the equities of this case. In view of negligence which substantially contributed to the making of the forged indorsements and its failure to prevent the loss despite its

opportunities to do so, West Penn was properly held to bear the resultant loss.

The verdict, which reflected principles of equity and is analogous to allocation of loss under the "unjust enrichment" doctrine,[24] complies with the Uniform Commercial Code. See §1-103[25] which provides: "Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Judgment affirmed.

---

CONCURRING OPINION BY JACOBS, J.:

I agree that PNB was the payee of the checks deposited in the four contribution accounts established by West Penn, and that the negligence of both PNB and West Penn substantially contributed to the making of the unauthorized signatures. I would not base the resolution of the case upon §1-103 and principles of equity, however, because section 3-419 (3) expressly mandates the result reached in this case. "Subject to the provisions of this Act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable

---

24. The restitutionary theory of recovery is designed to force "the defendant [UNB] to disgorge benefits [use of the proceeds of the embezzled checks] that it would be unjust for him to keep" and not to compensate the plaintiff. Dan B. Dobbs, Handbook on the Law of Remedies (1973), §4.1 at 224.

25. Act of April 6, 1953, P.L. 3, §1-103, eff. July 1, 1954. Reenacted Oct. 2, 1959, P.L. 1023, §1, eff. Jan. 1, 1960 (12A P.S. §1-103).

in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."[1]

CERCONE, J., joins in this concurring opinion.

1. Act of April 6, 1953, P.L. 3, §3-419 (3) *as reenacted,* 12A P.S. §3-419 (3) (1970).