**SWISS CREDIT BANK, Plaintiff,**

v.

**CHEMICAL BANK, Defendant.**

**No. 73 Civ. 4701 (CHT).**

United States District Court,
S. D. New York.

Oct. 20, 1976.

---

**55.** D.C.Code § 28–3813(a) (1973).

**56.** D.C.Code § 28–3812(b)(1), (e)(3) (1973); 5AA D.C.R.R. §§ 5.2, 5.5 (1970).

**57.** See Defendants' Opposition, p. 5.

Milbank, Tweed, Hadley & McCloy, New York City, for plaintiff; Roger Boyle, New York City, of counsel.

Bingham, Englar, Jones & Houston, New York City, for defendant; Joseph A. Kilbourn, James R. Sullivan, Nicholas Camera, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Plaintiff, Swiss Credit Bank ("Swiss Credit"), moves for summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that under Sections 3–404 and 3–406 of the New York Uniform Commercial Code ("N.Y.U.C.C." or the "Code") defendant Chemical Bank is precluded from denying its forged endorsements on three promissory notes, the subject matter of this suit. In the alternative, Swiss Credit moves for summary judgment on the ground of an alleged constructive fraud.

The following facts are not in dispute. The three promissory notes involved herein were purportedly made by Avery Brundage ("Brundage") on November 11, 1971 and due November 10, 1972, payable to the order of Er Shih Chiang ("Chiang") in the amounts of $350,000, $100,000 and $50,000 (Notes A, B, and C respectively). Each note bears the endorsement of the payee, Chiang, and purports to bear the endorsement of defendant Chemical Bank by Yerbury Burnham ("Burnham"), a vice-president of that bank. It is not disputed that at all times relevant hereto, Burnham had actual authority to act on behalf of Chemical Bank in endorsing promissory notes, communicating with other banks, and making representations of fact to such banks in the carrying out of Chemical Bank's banking business.

Prior to the transactions at issue in this suit Swiss Credit had extended lines of credit to Chiang. On two such occasions advances under those lines were secured by promissory notes made by Brundage, payable to the order of Chiang, and bearing Chemical Bank's endorsement by Burnham. On one of these occasions Burnham had forwarded to Swiss Credit two Brundage promissory notes which bore on their reverse side Burnham's obliteration of the words "signature guaranteed."

On February 8, 1972 Chiang approached Swiss Credit and requested that they increase his line of credit from 800,000 Swiss Francs to 1,800,000 Swiss Francs. As partial security for his indebtedness to Swiss Credit, Chiang offered Notes A ($350,000) and B ($100,000). On that date Swiss Credit, seeking to verify the endorsement of Chemical Bank by Burnham, which appeared on the reverse side of the notes, sent a telex message to Burnham at Chemical Bank requesting that he confirm Chemical Bank's endorsements on Notes A and B and asking whether Chiang could freely dispose of these notes. On the same date, Burnham sent a telex message to Swiss Credit requesting that it forward photocopies of Notes A and B to him for his inspection. Whether Burnham knew at this time that he had not endorsed these notes is disputed but not material. In any event, upon receipt of Chemical Bank's telex and on February 9, 1972, Swiss Credit mailed to Burnham photocopies of the front and reverse sides of Notes A and B and requested that Burnham reply to Swiss Credit by tested cable, i. e., a cable with a confidentially known test key which serves to guaranty the identity of the sender. On or about the same date, February 9, 1972, Chiang obtained Notes A and B back from Swiss Credit and on or about February 14, 1972 brought the notes to Burnham at Chemical Bank. Chiang told Burnham that he had forged Burnham's signature and the endorsement of Chemical Bank on the reverse side of the notes and asked Burnham not to inform Swiss Credit of the forgeries. Although Burnham knew that Chiang had committed forgery, he did not inform Swiss Credit of that fact. Instead, Burnham took Notes A and B from Chiang and obliterated the endorsements of Chemical Bank. On the same date, February 14, 1972, Burnham sent a telex to Swiss Credit without a test key, in reply to Swiss Credit's telex of February 8, 1972 and letter of February 9, 1972. Burnham, in the telex, replied to Swiss Credit's inquiries by stating "confirm all in order." Because Burnham's telex of February 14 did not bear a test key, the next day Swiss Credit sent a telex to Chemical Bank requesting that it reply to the earlier inquiries by a telex bearing a test key. In reply to Swiss Credit's February 15 telex, Burnham, on the same date, sent a telex to Swiss Credit, this time with a test key, again stating "confirm all in order." At the time that he was sending the February 14 and 15 telexes confirming to Swiss Cred-

it that all was in order, Burnham had in his possession Notes A and B and had obliterated the endorsements which he knew had been forged by Chiang. Burnham retained possession of Notes A and B until late March or early April 1972 when he returned them to Chiang, allegedly with the understanding that Chiang would return them to Brundage. However, on April 14, 1972, Chiang, having once again forged Chemical Bank's endorsement, presented Notes A and B to Swiss Credit as security for his existing indebtedness and for the purpose of expanding his line of credit. Swiss Credit took the notes in exchange for Chiang's blank amount promissory note which had been held by that bank as security since February 16, 1972 and for another promissory note of Brundage in the amount of $225,000. As of April 14, 1972 Chiang's debit balance was 1,203,561 Swiss Francs.

On or about April 28, 1972 Swiss Credit took allegedly as additional security for Chiang's line of credit, a third promissory note, Note C, bearing the purported signature of Brundage as maker, dated November 11, 1971 and due November 10, 1972, payable to the order of Chiang in the amount of $50,000. Note C bore Chiang's endorsement and the stamped endorsement of Chemical Bank bearing the purported signature of Burnham. At that time Chiang's indebtedness to Swiss Credit was 1,476,236 Swiss Francs. On the following day, April 29, 1972, Chiang died.

On the due date, November 10, 1972, all three notes—A, B, and C—were presented for payment in accordance with their terms, but payment was refused and the notes were dishonored and protested. Thereafter, in November 1972, Swiss Credit gave Chemical Bank notice of the protest and dishonor and presented the three notes to Chemical Bank, but Chemical Bank refused and still refuses to pay the notes. As of November 10, 1972 the debit balance in Chiang's account with Swiss Credit was 1,627,819.75 Swiss Francs.

In the light of the foregoing, Swiss Credit contends that Chemical Bank is liable to it, as a matter of law, on its contracts of endorsement on the three notes and for constructive fraud. This endorser's liability is based on two alternative theories. The first is that Chemical Bank is precluded from denying its endorsements under N.Y. U.C.C. § 3–404 because, under principles of estoppel, it must bear the loss caused by forgeries it could have prevented. The second is that Chemical Bank is precluded from denying its endorsement under N.Y.U. C.C. § 3–406 because its own negligence in giving Notes A and B back to Chiang, knowing that he had previously forged them, as a matter of law, substantially contributed to Chiang's subsequent forging of Chemical Bank's endorsements on the notes. Finally, Swiss Credit asserts that Chemical Bank is liable for constructive fraud.

Directing our attention to the first theory upon which Swiss Credit predicates its right to recover, we must determine whether Chemical Bank's actions in (1) sending the intentionally misleading telexes to Swiss Credit, (2) failing to notify Swiss Credit of Chiang's forgeries, and (3) returning Notes A and B to Chiang, knowing him to be a forger—all of which are uncontroverted—preclude Chemical Bank from denying its endorsements on all three notes, i. e., Notes A, B, and C, under the provisions of N.Y.U. C.C. § 3–404 which reads, in pertinent part, as follows:

"(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; . . ."

The Official Comment to this section states:

"The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precludes a denial of the signature." Comment 4.

Pursuant to the provisions of N.Y.U.C.C. § 1–201(43), an "unauthorized" signature specifically "includes a forgery."

■ Futhermore, N.Y.U.C.C. § 1–103, by its express terms, provides that the common law principles of equity and estoppel are preserved under it and are applicable to transactions falling within its purview. Thus, rights under that Code are governed by the common law rule of equitable estoppel that when one of two innocent persons is to suffer a loss caused by a wrongdoer (the forger), the person who enabled the forger to cause the loss must sustain it. *National Safe Deposit Co. v. Hibbs*, 229 U.S. 391, 33 S.Ct. 818, 57 L.Ed. 1241 (1913); *Bunge Corp. v. Manufacturers Hanover Trust Co.*, 31 N.Y.2d 223, 335 N.Y.S.2d 412 (1972); *West Penn Administration, Inc. v. Union National Bank*, 223 Pa.Super. 311, 335 A.2d 725 (Pa.Super.Ct.1975), *aff'g* 15 UCC Rep.Serv. 428 (Pa.C.P.1973) (hereinafter "*West Penn*").

■ Within this broad principle of estoppel is the specific rule that when a person knows that his signature is forged and nevertheless remains silent, he is precluded from asserting that forgery against one who dealt with the forger to his damage. *Hammond v. Varian*, 54 N.Y. 398 (1873); *Richmond Hill Realty Co. v. East Richmond Hill Land Co.*, 246 App.Div. 301, 285 N.Y.S. 424 (1st Dep't 1936); *National Production Co. v. Guardian National Bank of Commerce of Detroit*, 281 Mich. 230, 274 N.W. 774 (Mich.1937); *Brown v. Peoples National Bank*, 170 Mich. 416, 136 N.W. 506 (Mich. 1912); *Corner Stone Bank v. Rhodes*, 5 Ind. Terr. 256, 82 S.W. 739 (Ct.App.Ind.Terr. 1904).

In *West Penn, supra*, the court relied in part on § 8B of *Restatement (Second) Agency* (1958) which reads as follows:

"§ 8B. Estoppel—Change of Position

(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if

(a) he intentionally or carelessly caused such belief,

(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts."

Comment (c) to § 8B provides:

"In many situations one may be deprived of a right of action, be subject to an action or even lose his property by failing to reveal the truth if he knows that another is acting or will act under a misapprehension . . . .. There may even be liability based on a failure to speak, as where one knows that another is purporting or has purported to contract as his agent or to receive money on a forged instrument, and fails to reveal the facts."

■ Chemical Bank here had a duty to disclose forgeries analogous to the duty of a depositor under N.Y.U.C.C. § 4–406. *See Federal Insurance Company v. Groveland State Bank*, 44 A.D.2d 182, 354 N.Y.S.2d 220 (App.Div. 4th Dep't 1974). Chemical Bank maintained a business relationship with Swiss Credit involving regular communications between the two concerning various banking transactions, including communications relative to their mutual customer, Chiang. Accordingly, it can be argued that the reliance of Swiss Credit on Chemical Bank was as great as that of a bank on a depositor and, accordingly, that Chemical Bank had the same duty as a depositor to report forgeries of its signature.

It is, of course, necessary to distinguish between the *equitable estoppel* implicit in N.Y.U.C.C. § 3–404, and the *preclusion*, also implicit in that section but predicated upon negligence, under N.Y.U.C.C. § 3–406. This distinction is of some importance, since Chemical Bank has suggested various "material" facts as to which it asserts a genuine issue exits, but such facts are material only insofar as liability is predicated upon N.Y. U.C.C. § 3–406 or upon constructive fraud. Chemical argues correctly that Notes A and B, when taken by Swiss Credit on April 14, 1972, were not the same notes to which the telexes of February 14 and 15 referred, since the forged endorsements had been obliterated by Burnham in February and

the new forged endorsements were not placed on these two notes until late March or early April after Burnham had returned them to Chiang. It is not disputed that no further confirming telexes with respect to these notes were sent by Chemical bank or requested by Swiss Credit after February 15, 1972. Chemical Bank argues that the obliteration of the earlier forged endorsement and the upside-down position of the later forged endorsement should have put Swiss Credit on notice of the possibility of forging and raises the issue of that bank's "good faith."

■ Chemical Bank argues that "Swiss Credit must demonstrate that it acted in good faith before it can invoke the principle of estoppel." (Chem.Bk.Br. p. 9). It does not specify whether such demonstration is necessary under § 3–404 or § 3–406. Chemical Bank does not argue that Swiss Credit acted in "bad faith" but instead points to the obliterations which appeared on Notes A and B and the location of the endorsements on those Notes when accepted by Swiss Credit as facts which should have put Swiss Credit "on notice of a possible infirmity in the Notes." (Chem.Bk.Br. pp. 9–10). Thus at the outset, Chemical Bank confuses the concepts of notice and good faith. Chemical Bank's confusion in this respect is undoubtedly aided by its reliance upon certain early New York cases which did indeed hold that, with respect to negotiable instruments, constructive notice might raise a question as to good faith under some circumstances. Thus, in its argument that a question of good faith is presented, Chemical Bank relies entirely upon cases decided on the basis of pre-Code New York law. (Chem.Bk.Br. pp. 11–16). To the extent that these cases require more than honesty in fact they have been legislatively overruled with the adoption of the Code in New York. N.Y.U.C.C. § 1–201(19) provides that "'[g]ood faith' means honesty in fact in the conduct or transaction concerned." Chemical Bank has not even suggested Swiss Credit was in any way dishonest or that it knew that the Chemical Bank endorsements were forged. Accordingly, Swiss Credit clearly satisfies the good-faith requirement as defined by § 1–201(19). Thus, Chemical Bank is estopped, by virtue of § 3–404, from denying its endorsement of the three notes.

We turn, then, to the second alternative theory upon which Swiss Credit predicates its right to recovery, namely, that the negligence of Chemical Bank contributed to the forgery by Chiang of the Chemical Bank endorsements.

N.Y.U.C.C. § 3–406 provides as follows:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

Comment 7 to § 3–406 makes it clear that conduct like Chemical Bank's would be considered negligence under that section. The Comment states, in pertinent part:

"The section extends . . . to cases where the party has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person."

■ Of course, in order to have the benefits of § 3–406, Swiss Credit must be a holder in due course. Under the provisions of N.Y.U.C.C. § 3–302(1):

"A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

Under the provisions of N.Y.U.C.C. § 3–303(b):

"A holder takes the instrument for value

(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due."

■ In the instant case Swiss Credit clearly satisfies the requirement of § 3–302(1)(a) since it took the notes as security for Chiang's outstanding line of credit, an "antecedent claim" § 3–303(b). The good-faith requirement of § 3–302(1)(b) is also satisfied as discussed above.

Chemical Bank asserts, however, that there is a triable issue as to whether Swiss Credit took the notes "without notice . . of any defense against or claim to it" as required by § 3–302(1)(c). Under § 3–304:

"(1) The purchaser has notice of a claim or defense if

(a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay;

.     .     .     .     .

(7) In any event, to constitute notice of a claim or defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith."

■ Chemical Bank claims that Swiss Credit had reason to know of the forgeries because of the obliterations on Notes A and B, Chiang's "explanation" to Swiss Credit when he presented these notes in April that the obliterations had been made by a bank other than Chemical Bank in connection with another transaction in the intervening period, and by Swiss Credit's possession of photostats of the notes as they existed when first presented to it in February 1972. Chemical Bank further argues that the up-side-down placement of the new forged Chemical Bank endorsement beneath the Chiang endorsement after the obliteration of the earlier forged Chemical Bank endorsement should have awakened suspicions in Swiss Credit as to the true character of the notes. However, there is nothing suspi-

cious or improper *per se* about the obliteration of endorsements. N.Y.U.C.C. § 3–605(1) provides that a holder of an instrument can discharge any party in any manner *apparent* on the face of the instrument or the endorsement, as by intentionally striking out the party's signature. N.Y.U.C.C. § 3–602, in providing that no discharge of a party is effective against a subsequent holder in due course unless he has notice of it when he takes the instrument, shows that the effectiveness of the cancellation to discharge an endorser depends on whether it is apparent on the instrument. The other assertions by Chemical Bank do not show that Swiss Credit had reason to *know* the endorsements were forged. At most, they were circumstances which may have been suspicious, but mere suspicious circumstances do not amount to constructive notice of a defense or show that an instrument was taken in bad faith and do not impose upon the transferee the duty of inquiry, under either pre-Code or post-Code law.

It therefore appears that, as a matter of law, Swiss Credit became a holder in due course under the provisions of § 3–406. We then are faced with the question whether Chemical Bank, through Burnham, by *negligence*, substantially contributed to the forgery of the notes and is thereby precluded from asserting the forgery as against Swiss Credit. Negligence is not normally determined by way of summary judgment. Nor do the material facts not in issue in this case necessarily lead to a finding of negligence. When Burnham first learned of the forgeries of the Chemical Bank endorsements from Chiang he obliterated such endorsements and retained possession of the notes. There is no evidence that when he returned the notes to Chiang several weeks later he did so with the knowledge that Brundage's signature was forged or that Chiang intended to negotiate the notes with or without a new forged endorsement by Chemical Bank. Indeed, there is evidence that Chiang represented that he intended to return the notes to Brundage in exchange for new notes. Thus, while Burnham was made aware in April that Chiang was still conducting at least limited business rela-

tions with Swiss Credit, he had no reason to suspect that the "bombs" he had "defused" would be rearmed and presented to Swiss Credit once again. It is not disputed that Swiss Credit, subsequent to the February telexes, made no further effort to reconfirm the notes which, so far as Burnham knew, had been returned to Brundage. One must infer, for the purposes of this motion, that had inquiry been made of Burnham the latter would not have confirmed the latest forged endorsements.

While it would appear from the foregoing that, insofar as preclusion under § 3–406 is concerned, issues of fact were raised as to the negligence of Chemical Bank and the possible contributory negligence of Swiss Credit, considerations of negligence would not appear relevant insofar as equitable estoppel under § 3–404 is concerned, since Swiss Credit would not have to be a holder in due course under § 3–404 as it would under § 3–406. Accordingly, there are no genuine issues as to material facts giving rise to the equitable estoppel of Chemical Bank to deny its endorsement on the notes in question, and partial summary judgment may be awarded for the face amount of the notes with interest. *Sterling National Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870 (2d Cir. 1975). Since the resolution of the plaintiff's claim of constructive fraud requires the determination of material facts which are in dispute, however, summary judgment for the damages (*i. e.*, those beyond the face amount of the notes) alleged to have resulted from that fraud cannot be granted.

In accordance with this opinion, enter partial summary judgment within thirty days.

So ordered.